No. 24-2269

IN THE
# United States Court of Appeals for the Ninth Circuit

SMART APPAREL (U.S.), INC.,

*Plaintiff-Appellant,*

*v.*

NORDSTROM, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Western District of Washington
No. 2:23-cv-01754-TLF, Hon. Theresa L. Fricke

## OPENING BRIEF FOR PLAINTIFF-APPELLANT
## SMART APPAREL (U.S.), INC.

Christopher J. Cariello
Katherine E. Munyan
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Plaintiff-Appellant Smart Apparel (U.S.), Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Smart Apparel (U.S.), Inc. hereby states it is a domestic privately held nongovernmental company wholly owned directly by its private foreign parent company, Smart Apparel Group Ltd. No public company holds a direct ownership interest of 10% or more in Smart Apparel (U.S.), Inc. Smart Apparel Group Ltd. is wholly owned by Zhejiang Sunrise Garment Group Co., Ltd (Sunrise), a publicly listed company in China. Sunrise has many public shareholders; to Smart Apparel's knowledge, Ningbo Sunrise Textile Co., Ltd., Youngor Dresses Share Holding Co., Ltd., and Itochu Textile Prominent (Asia) Ltd. own greater than 10% of Sunrise's stock.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/Christopher J. Cariello*
Christopher J. Cariello
*Counsel for Plaintiff-Appellant*
*Smart Apparel (U.S.), Inc.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................i

TABLE OF AUTHORITIES ..................................................iv

INTRODUCTION .............................................................. 1

JURISDICTIONAL STATEMENT ........................................ 5

STATEMENT OF THE ISSUES ........................................... 5

STATEMENT OF THE CASE ............................................... 6

    Smart Apparel Supplies High-Quality Garments To
        Retailers Like Nordstrom Through A Supply Chain
        Free Of Forced Labor. .............................................. 6

    U.S. Customs And Border Protection Issues A Press Release
        Wrongly Suggesting Use Of North Korean Labor At
        Smart Apparel's Corporate Parent. ........................... 8

    Struggling To Move Its Inventory, Nordstrom Uses The CBP
        Press Release As A Pretext For Cancelling $6.7 Million
        In Orders. ............................................................... 12

    The District Court Dismisses Smart Apparel's Complaint
        Finding That The CBP Press Release Justifies
        Nordstrom's Termination ........................................ 15

SUMMARY OF ARGUMENT ............................................. 18

STANDARD OF REVIEW .................................................. 25

ARGUMENT .................................................................. 25

I.    The District Court Erred In Dismissing Smart Apparel's
    Claim For Breach Of Contract. ....................................... 25

    A.    The Sanctioned Person warranties do not permit
        cancellation based on the CBP press release. ...................... 26

        1.    Neither Sanctioned Person warranty applies
            because the CBP press release did not provide
            reason to believe that Sunrise is a Sanctioned
            Person. ....................................................... 27

2. The "dealings" with a Sanctioned Person warranty does not apply for the additional reason that Nordstrom had no reason to believe there were "dealings" "in connection with" the order. ................... 35

3. The "interest" in a Sanctioned Person warranty is also inapplicable because it is not a basis for contract cancellation. ................................................. 36

B. The CBP press release did not provide reason to believe Smart Apparel failed to comply with the Forced Labor warranties. ........................................................... 44

II. The District Court Erred In Dismissing Smart Apparel's Claim For Breach of Implied Covenant of Good Faith and Fair Dealing. ................................................................... 49

CONCLUSION ........................................................................ 57

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Badgett v. Sec. State Bank,*
  807 P.2d 356 (Wash. 1991) ................................................................ 50

*Blue Mountain Mem'l Gardens v. State Dep't of Licensing,*
  *Cemetery Board,*
  971 P.2d 75 (Wash. Ct. App. 1999) .................................................... 34

*Cavell v. Hughes,*
  629 P.2d 927 (Wash. Ct. App. 1981) ................................................... 55

*Century 21 Real Est. Ctr. v. Silvers,*
  130 Wash. App. 1030 (2005) ............................................................... 51

*Cont'l T. V., Inc. v. GTE Sylvania Inc.,*
  433 U.S. 36 (1977) ............................................................................... 33

*Curtis v. N. Life Ins. Co.,*
  147 Wash. App. 1030 (2008) ............................................................... 50

*Ernst & Haas Mgmt. Co. v. Hiscox, Inc.,*
  23 F.4th 1195 (9th Cir. 2022) ............................................................. 25

*Frank Coluccio Constr. Co. v. King County,*
  150 P.3d 1147 (Wash. Ct. App. 2007) .......................................... 50, 53

*Helfand v. Nat'l Union Fire Ins. Co.,*
  10 Cal. App. 4th 869 (1992) ................................................................ 51

*Hensel Phelps Constr. Co. v. King County,*
  787 P.2d 58 (Wash. Ct. App. 1990) ............................................... 37, 44

*Jones Assocs., Inc. v. Eastside Props., Inc.,*
  704 P.2d 681 (Wash. Ct. App. 1985) ................................................... 43

*Jones v. Hollingsworth,*
  560 P.2d 348 (Wash. 1977) ................................................................. 55

*Judd v. Weinstein,*
967 F.3d 952 (9th Cir. 2020)..........................................25, 32, 44, 55

*Kitsap County v. Allstate Ins. Co.,*
964 P.2d 1173 (Wash. 1998) ......................................................30, 40

*Lombardo v. Pierson,*
852 P.2d 308 (Wash. 1993) ...............................................................30

*In re Marriage of Sievers,*
897 P.2d 388 (Wash. Ct. App. 1995)..................................................51

*Metro. Park Dist. of Tacoma v. Griffith,*
723 P.2d 1093 (Wash. 1986) .............................................................50

*Rekhter v. State Dep't of Soc. & Health Servs.,*
323 P.3d 1036 (Wash. 2014) ......................................................50, 54

*Ross v. Harding,*
391 P.2d 526 (Wash. 1964) ........................................................41, 44

*Scribner v. Worldcom, Inc.,*
249 F.3d 902 (9th Cir. 2001)...............................28, 39, 51, 52, 53, 54

*Spokane Helicopter Serv., Inc. v. Malone,*
623 P.2d 727 (Wash. Ct. App. 1981)..................................................37

*Tank v. State Farm Fire & Cas. Co.,*
715 P.2d 1133 (Wash. 1986) .............................................................53

*Taylor v. Shigaki,*
930 P.2d 340 (Wash. Ct. App. 1997)..................................................51

*Viking Bank v. Firgrove Commons 3, LLC,*
334 P.3d 116 (Wash. Ct. App. 2014)..................................................28

*Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.,*
952 P.2d 590 (Wash. 1998) ......................................................29, 40

**Statutes & Regulations**

19 C.F.R. § 12.42 ...............................................................................9, 34

19 C.F.R. § 12.43 ............................................................. 10

19 C.F.R. § 12.44 ............................................................. 34

19 C.F.R. § 151.16 ........................................................... 33

6 U.S.C. § 211 .................................................................. 9

18 U.S.C. § 1332 ............................................................... 5

19 U.S.C. § 1307 ............................................................... 8

22 U.S.C. § 9241a ....................................................... 10, 31

28 U.S.C. § 1291 ............................................................... 5

Uyghur Forced Labor Prevention Act,
    Pub. L. No. 117-78, 135 Stat. 1525 (2021).................................. 10, 47

## Other Authorities

Congressional Research Service, *National Security Review
    Bodies: Legal Context and Comparison* (Nov. 9, 2022),
    https://crsreports.congress.gov/product/pdf/LSB/LSB10848 ............. 30

Restatement (Second) of Contracts § 205 (1979) ................................. 52

U.S. Customs and Border Protection, *Philadelphia CBP
    Intercepts 40 Unpermitted Incubated Chick-Hatching
    Eggs* (Aug. 8, 2019), https://www.cbp.gov/newsroom/local-
    media-release/philadelphia-cbp-intercepts-40-
    unpermitted-incubated-chick-hatching .................................... 9

U.S. Dep't of Homeland Security, *UFLPA Frequently Asked
    Questions* (last updated July 9, 2024),
    https://www.dhs.gov/uflpa-frequently-asked-questions ..................... 48

## INTRODUCTION

Nordstrom hung a long-time garment supplier out to dry—and used baseless human rights concerns to justify it.

For years, Appellant Smart Apparel, a Hong Kong-based garment company, made men's dress shirts for Nordstrom. Time and again over those years, Smart Apparel showed Nordstrom, through independent audits, that its supply chain was free of forced labor. But in late 2022, Nordstrom had a business problem. Sales of dress shirts had dwindled during the Covid-19 pandemic. Nordstrom's inventory was bloated. It had already ordered another $6.7 million-worth of shirts from Smart Apparel. And the Nordstrom-drafted purchase order did not allow Nordstrom to cancel an order just because it did not want it.

So Nordstrom seized on a pretext. United States Customs and Border Protection (CBP) had recently issued a press release suggesting (without proof) that CBP had uncovered illegal use of North Korean labor in the supply chain of Zhejiang Sunrise Garment Group Ltd (Sunrise). Sunrise is a large conglomerate, and Smart Apparel is one of its many subsidiaries. Sensing an opportunity, Nordstrom used the press release about *Sunrise* to trigger contractual termination rights

applicable where Nordstrom has "reason to believe" that *Smart Apparel* has breached representations concerning its labor practices. It did so even though it knew, from years of audits, that Smart Apparel's supply chain was clean. And it did so without even asking Smart Apparel for an explanation.

Ultimately, CBP's press release amounted to nothing. CBP never sanctioned Sunrise. It never even detained a single Sunrise import. An independent audit a few months later proved that Sunrise did not use North Korean labor. And, of course, none of this ever had anything to do with subsidiary Smart Apparel and its small supply chain of four facilities, none close to North Korea. Further proof that Nordstrom's feigned human rights concerns were just that: It kept and continued to sell dress shirts from immediately preceding orders, knowing full well they were untainted. But it still refused to accept and pay for the 342,000 additional pieces it had ordered.

Smart Apparel brought this lawsuit to vindicate its contractual right to be paid for Nordstrom's order and its good name. But the district court dismissed Smart Apparel's breach-of-contract and good-faith-and-fair-dealing claims at the pleading stage. It found that the

2

CBP press release alone gave Nordstrom "reason to believe" that Sunrise was a "Sanctioned Person"—though Sunrise was never actually sanctioned—and that Smart Apparel had used forced labor—even though the Complaint squarely alleged Nordstrom's knowledge that Smart Apparel did not.

The district court's ruling is erroneous through and through. Among other errors, the court misinterpreted the purchase order's warranty concerning Smart Apparel's relationship with "Sanctioned Persons" to embrace a CBP press release that—as a matter of U.S. trade law—announced only a *rebuttable presumption* that Sunrise had used North Korean labor. And in finding that Nordstrom had "reason to believe" Smart Apparel used forced labor, the court ignored unmistakable allegations in the Complaint that Nordstrom believed just the opposite. It thus erred in dismissing the breach-of-contract claim. *Infra* § I.

It also erred in finding that Nordstrom's pretextual conduct did not breach the covenant of good faith and fair dealing. In the court's view, its finding that Nordstrom had discretion to terminate the purchase orders based on the CBP press release also required dismissal

3

of the good-faith-and-fair-dealing claim. That is wrong under Washington law. Where one party possesses broad-but-delineated discretion under a contract—as the district court found Nordstrom had here—that party is duty-bound to exercise that discretion in good faith. The Complaint directly and repeatedly explains how Nordstrom, motivated by business interests, exercised its discretion in a dishonest manner. That states a good-faith-and-fair-dealing claim. *Infra* § II.

The labor issues underlying this case are extraordinarily important—and indeed, Smart Apparel's longstanding compliance with ethical standards is a point of great pride. But this case is also about power. It is doubtless true that a massive American retailer like Nordstrom has immense power to dictate the terms of purchase orders with its foreign manufacturers. But that power has legal limits. Nordstrom must respect its contractual undertakings and exercise its discretion in good faith. Smart Apparel has plausibly pled that Nordstrom failed to do so. This Court should reverse and allow the claims to proceed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 1332. It entered judgment on March 11, 2024. ER-3. Smart Apparel timely filed its notice of appeal on April 9, 2024. ER-59. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     The CBP press release Nordstrom relied upon to cancel its orders announced a "rebuttable presumption" that Smart Apparel's parent company, Sunrise, had used North Korean labor. The press release did not announce a final determination that Sunrise used such labor, nor that it would be sanctioned. The press release did not say anything about Smart Apparel. And Nordstrom knew that Smart Apparel did not use North Korean or forced labor in its own supply chain. Did the district court err in dismissing Smart Apparel's breach-of-contract claim by finding that the CBP press release gave Nordstrom reason to believe that Smart Apparel had failed to comply with warranties regarding sanctioned persons and forced labor?

II.     The district court found that the purchase orders give Nordstrom broad discretion to refuse orders in various defined

circumstances.  As Smart Apparel alleged, Nordstrom exercised that discretion in bad faith when it used the CBP press release as a pretext to claim that its termination rights had been triggered.  Did the district court err in finding that these allegations do not state a good-faith-and-fair-dealing claim under Washington law?

## STATEMENT OF THE CASE

### *Smart Apparel Supplies High-Quality Garments To Retailers Like Nordstrom Through A Supply Chain Free Of Forced Labor.*

Smart Apparel is a Hong Kong-based manufacturer and wholesaler that produces apparel for high-end brands and retailers. ER-25-26, 29.  To make these garments, Smart Apparel first sources fabric from mills in Vietnam and China.  ER-30.  Its employees then make the garments in two factories in Sri Lanka.  *Id.*

Smart Apparel prides itself on following the "highest ethical standards in all stages of its manufacturing and production process." ER-30.  It does not use cotton from regions known to use forced labor in farming.  ER-31.  And it ensures that its fabric is produced without use of forced labor by commissioning regular independent audits of the fabric mills that it uses.  ER-30.

6

As for its garment assembly factories, Smart Apparel commissions regular, independent audits to ensure and demonstrate that no forced labor is used. ER-28, 30. These audits are comprehensive assessments of its facilities, evaluating not just for use of forced labor, but for "wage underpayment, excessive working hours, child labor, unauthorized subcontractors, and prison labor, among other categories." ER-30.

"None of the audits of the[se] fabric mills or garment assembly facilities … has ever indicated any use of forced labor or North Korean labor at any of the inspected facilities." ER-31. Smart Apparel's strict and transparent compliance with high ethical standards has allowed it to build a successful business that employs foreign workers to produce high-quality garments, which it then imports to high-end retailers in the United States. ER-30.

For many years, Nordstrom was one of these retailers. Nordstrom was well-acquainted with Smart Apparel's glistening track record. ER-27-28, ER-30, ER-32-33. In its purchase-order contracts with Nordstrom, Smart Apparel always warranted that all merchandise it made for Nordstrom was produced without using "any involuntary labor of any kind." ER-52. Its audit procedures also complied with

7

Nordstrom's own requirements, and Smart Apparel not only "shared and discussed" the results with Nordstrom, but "routinely collaborate[d]" on best practices for demonstrating that Smart Apparel's supply chain was clean. ER-30.

### U.S. Customs And Border Protection Issues A Press Release Wrongly Suggesting Use Of North Korean Labor At Smart Apparel's Corporate Parent.

Of course, Smart Apparel's ethical labor practices are not just between it and its customers. All of Smart Apparel's imports must comply with U.S. laws and regulations governing international trade, enforced by U.S. Customs and Border Protection. This case does not arise from any CBP action taken against Smart Apparel, nor any claim by CBP that practices at Smart Apparel's mills or factories violated U.S. law. Instead, the dispute underlying this case began when CBP— wrongly, it turned out—issued a press release suggesting that Smart Apparel's corporate parent, Sunrise, had used North Korean labor in its supply chain.

Some context is useful. U.S. law generally prohibits importing goods produced with forced labor. 19 U.S.C. § 1307. CBP enforces this prohibition, along with the many other U.S. laws and regulations

governing imports, at the border. *See* 6 U.S.C. § 211(c). For many laws CBP enforces, CBP need only inspect the goods themselves to determine that they are inadmissible—say, that boxes labeled "wine glasses" in fact contain hatching chicken eggs. *See, e.g.*, U.S. Customs and Border Protection, *Philadelphia CBP Intercepts 40 Unpermitted Incubated Chick-Hatching Eggs* (Aug. 8, 2019), https://www.cbp.gov/ newsroom/local-media-release/philadelphia-cbp-intercepts-40-unpermitted-incubated-chick-hatching. But while examining a box of shirts can confirm that the box contains shirts and not chicken eggs, it will not reveal whether the shirts inside were produced with forced labor. So enforcing forced-labor prohibitions requires investigation beyond a border inspection.

CBP traditionally investigates possible use of forced labor by issuing "Withhold Release Orders" detaining merchandise if CBP has "reason to believe" it was produced with forced labor. 19 C.F.R. § 12.42. But these detentions are not final bars on admissibility; the importer is entitled to process before any final sanction is imposed. If the importer supplies evidence that no forced labor was employed in producing the

merchandise, CBP will—as the term "withhold release" suggests—release the merchandise for importation. 19 C.F.R. § 12.43.

While CBP issues Withhold Release Orders based on suspicions about specific shipments, Congress has also passed laws creating "rebuttable presumptions" that all merchandise from a particular source has been produced in a supply chain with forced labor. As relevant here, the Countering America's Adversaries Act (CAATSA) created a "rebuttable presumption" that goods made with North Korean labor were produced with forced labor.[1] This presumption works like a traditional Withhold Release order. The importer is entitled to show that its supply chain is free of prohibited labor, and a "prohibition [on entry] … shall not apply if [CBP] finds, by clear and convincing evidence" that no forced labor was used. 22 U.S.C. § 9241a.

On December 27, 2022, CBP issued a press release stating that it was "detaining merchandise produced or manufactured by" three Chinese companies pursuant to CAATSA's rebuttable presumption.

---

[1] Pub. L. No. 115-44, tit. III (Sanctions with Respect to North Korea), § 302A, 131 Stat. 886 (2017), 22 U.S.C. § 9241a; *see also* Uyghur Forced Labor Prevention Act (UFLPA), Pub. L. No. 117-78, 135 Stat. 1525 (2021) (creating a similar rebuttable presumption for goods produced within a region of China).

ER-35; *see* ER-22-23. One of the companies was "Zhejiang Sunrise Garment Group Co. Ltd.," Smart Apparel's ultimate corporate parent; the others were unrelated. ER-35. The press release stated that a CBP investigation had "indicat[ed]" that Sunrise "use[d] North Korean labor in [its] supply chain[] in violation of" CAATSA. ER-35; *see* ER-22.

The CBP press release did not reference Smart Apparel, nor implicate any of Smart Apparel's mills or factories. ER-36; *see* ER-22-24. And it did not find conclusively that Sunrise had used forced labor or otherwise violated any human rights obligations. Consistent with the rebuttable presumption process, CBP stated that it would "detain" Sunrise's merchandise for Sunrise to present "clear and convincing evidence that forced labor was not present at any stage of the production process." ER-35; *see* ER-22.

Following the press release, however, CBP never actually detained "a single piece of merchandise produced or manufactured by Sunrise." ER-35, 40. Nor did it ever issue a formal finding indicating any conclusion that Sunrise had used forced labor; impose "any restrictions on doing business with Sunrise under United States law"; or "prohibit[]" Sunrise from "importing goods into the United States." ER-40.

11

***Struggling To Move Its Inventory, Nordstrom Uses The CBP Press Release As A Pretext For Cancelling $6.7 Million In Orders.***

Around this time, Nordstrom was having inventory problems. Though the Covid-19 pandemic had abated, many Americans were still working from home. ER-41. This meant sharply reduced demand for dress shirts. *Id.* By the fourth quarter of 2022, Nordstrom's inventory of men's dress shirts was bloated. *Id.*; ER-28-29.

Smart Apparel could see this. For many of Nordstrom's orders, after importing the shirts into the United States, Smart Apparel would store them in its U.S. warehouses until Nordstrom needed them in stores. ER-31. Smart Apparel saw that Nordstrom's shirts were not moving, and that its inventory of shirts waiting in Smart Apparel's warehouses was higher than it had been at any point since the pandemic began. ER-28-29. Yet Nordstrom had pending orders with Smart Apparel for hundreds of thousands of additional men's dress shirts, costing $6.7 million. ER-41-42.

That Nordstrom no longer wanted these shirts was no basis for cancelling the order. Paragraph 4 of the Terms and Conditions permitted Nordstrom to "refuse delivery or return the [commissioned]

merchandise" only under seven specified circumstances. ER-51. None permitted cancellation due to a mistake on Nordstrom's end. *See id.*

So Nordstrom used the CBP press release concerning *Sunrise* as an excuse to get out of the order from *Smart Apparel*. On January 13, 2023, Nordstrom emailed Smart Apparel "cancelling all outstanding orders for which the product has not cleared customs in the destination country as of the time of this email." ER-33. Nordstrom claimed that the CBP press release gave it "compelling reasons to believe that the manufacture of Smart Apparel products has involved violations of our Purchase Order Terms and Conditions, including the provisions regarding forced labor." ER-34. This, presumably, was a reference to the purchase order's Paragraph 4, which permitted Nordstrom to refuse "[s]hipments which [it] has reason to believe are not in compliance with the provisions of the applicable Vendor Purchasing Guide, including … forced labor requirements." ER-51.

But this was a sham. Nordstrom did not in fact have reason to believe that Smart Apparel had violated forced labor requirements, based on the CBP press release or otherwise. ER-34. It knew that Smart Apparel's supply chain was free of forced labor. *Id.* It knew the

13

fabrics for its orders had been manufactured at two fabric mills, one in Vietnam and one in China, both of which had been independently audited by third-party auditors within the past year, both of which audits confirmed that "no North Korean or forced labor was used at either facility." ER-32. And it knew that Smart Apparel's garments had been assembled at two specific factories in Sri Lanka, which had similarly been audited by third parties who found no "use of North Korean or forced labor." ER-32-33. In fact, Nordstrom had recently "provided positive feedback to Smart Apparel concerning" the "ethical practices at these facilities." ER-33.

If Nordstrom had any doubt, Smart Apparel was a phone call away. Surely Nordstrom, if acting in good faith, would give its long-time business partner the opportunity to demonstrate yet again that its supply chain was clean. But Nordstrom did not ask Smart Apparel about the CBP press release, request further information, or conduct any investigation. ER-27, ER-41.

When Smart Apparel took the initiative, Nordstrom rebuffed it. In the days after Nordstrom's cancellation, Smart Apparel representatives flew to Nordstrom's headquarters and "demonstrate[d]

14

to Nordstrom, in person, that its supply chain did not use any forced or North Korean labor." ER-28. Yet Nordstrom proceeded with the cancellation. *Id.* Nordstrom even refused to rescind its cancellation after Smart Apparel commissioned a third-party auditor to audit the entire supply chain of *Sunrise*, which audit found no forced labor or use of North Korean labor. ER-42.

In short, Nordstrom did not cancel its order because of ethical concerns. Indeed, it continued to sell hundreds of thousands of the same Smart Apparel shirts from Nordstrom's prior order—hardly what you would expect if Nordstrom really believed these garments were tainted. ER-28. Nordstrom cancelled the orders because it wanted to save money on merchandise it no longer needed. ER-34-35.

### The District Court Dismisses Smart Apparel's Complaint Finding That The CBP Press Release Justifies Nordstrom's Termination.

When Nordstrom refused to rescind or otherwise take financial accountability for its inappropriate cancellation, Smart Apparel brought claims for breach of contract and breach of implied covenant of good

faith and fair dealing under Washington state law.[2] ER-25-49.

Nordstrom moved to dismiss. Without holding a hearing, the district

court dismissed Smart Apparel's claims with prejudice.

The district court relied on Paragraph 4, which allows Nordstrom

to "refuse delivery … for" "Merchandise which [Nordstrom] has reason

to believe is not as represented or as warranted" or "Shipments which

[Nordstrom] has reason to believe are not in compliance with the

provisions of the applicable 'Vendor Purchasing Guide,' including …

U.S. or Canada customs requirements, and child or forced labor

requirements." ER-10 (citing ER-51). Adopting Nordstrom's reading of

the Nordstrom-drafted purchase order, the court then found that "the

press release"—and the press release alone—"provided reason to believe

that Smart Apparel had violated" warranties "in four ways" contained

across three other provisions. ER-12.

The relevant provisions warrant in relevant part:

_____

[2] Smart Apparel also brought quasi-contract claims, pled in the alternative, for promissory estoppel and breach of contract implied in fact. ER-16. Because the district court found that a valid contract governed the orders, the quasi-contract claims are unnecessary and not at issue here. *See* ER-16.

> **Paragraph 7.** Smart Apparel "does not and will not …, through its own operation or its supply chain, use … any involuntary labor of any kind."

> **Paragraph 8.** "[N]either [Smart Apparel] nor any party working on [its] behalf is a Sanctioned Person or engages in any dealings, directly or indirectly, with a Sanctioned Person … in connection with the purchase order, and no Sanctioned Person has any interest of any nature whatsoever in [Smart Apparel] or any party working on [its] behalf."

> **Paragraph 9.** Merchandise "was produced and processed in strict compliance with all applicable … laws, regulations, [and so forth] … of the … country of destination, including but not limited to … labor, trade sanctions, export [or] import/customs … laws and regulations."

ER-10-11 (citing ER-52).

Again, the district court relied solely and repeatedly on "the CBP Press Release" as establishing "reason to believe" that Smart Apparel had breached all of the above warranties, whether or not Nordstrom *actually* believed any of it. *See* ER-11-12. With respect to warranties about Smart Apparel's own supply chain, the court did not explain how a press release about *Sunrise* would mean anything as to Smart Apparel—particularly in light of Smart Apparel's allegations concerning Nordstrom's *actual* knowledge concerning Smart Apparel's supply chain. *See* ER-12-13. And when it came to whether Sunrise is a "Sanctioned Person," the district court found that the contract

17

unambiguously classified an entity subject to a mere *presumption* concerning inadmissibility as such. *See* ER-13.

The district court then dismissed Smart Apparel's claim for breach of the implied covenant of good faith and fair dealing in a single line of reasoning. Despite recognizing that "[b]reach of good faith and fair dealing does not require breach of the terms of the contract," the district court held that Smart Apparel's claim fell because "[t]he Court has already determined that the terms of the contract are unambiguous and that [t]he CBP Press Release provided a reason for Nordstrom to believe that the terms of the contract had been violated and to cancel the orders." ER-15. The district court did not address Smart Apparel's allegations that Nordstrom had acted dishonestly and in bad faith in claiming contractual grounds to cancel its orders.

## SUMMARY OF ARGUMENT

I. The district court erred in dismissing Smart Apparel's breach-of-contract claim. The district court based its dismissal solely on its conclusion that the CBP press release gave Nordstrom "reason to believe" Smart Apparel had violated the "Sanctioned Person" and

"forced labor" warranties in the contract. This conclusion was rife with error.

A. The Sanctioned Person warranties do not permit cancellation based on the CBP press release. The district court held to the contrary by reasoning that the CBP press release gave Nordstrom "reason to believe" that Sunrise was a Sanctioned Person, and therefore that Smart Apparel had violated its contractual warranties (1) that no Sanctioned Person had an "interest" in Smart Apparel and (2) that Smart Apparel did not engage in any "dealings" with any Sanctioned Person "in connection with this purchase order." ER-12. That was error.

1. Neither Sanctioned Person warranty applies because the CBP press release did not provide a reason to believe that Sunrise was a Sanctioned Person. The purchase order defines a Sanctioned Person as "a person, entity, or government" that is either "(i) identified on the Specially Designated Nationals and Blocked Persons List … and/or any similar list" or "(ii) subject to trade restrictions under United States law, including … [CAATSA]." ER-52. It does not define "trade

19

restrictions" and the district court erred in holding that the CBP press release qualified as one.

The term "trade restrictions" in context refers to a final designation of an entity's status that bars it from importing into the United States. That is the only reading consistent with both the term "trade restrictions" is defining—"Sanctioned Person"—and the alternative definition—designation on an official sanctions list—both of which refer to final designations of a party's status under U.S. law.

The CBP press release was not a trade restriction because it was not a final determination as to Sunrise's status. It simply announced application of a "rebuttable presumption," a preliminary step requiring Sunrise to submit evidence regarding its supply chain to avoid future sanctions. And CBP never even actually detained any Sunrise shipments or required it to provide further evidence.

The district court's ruling effectively transformed a rebuttable presumption into a final sanction. This is contrary to the language of the press release and CBP's procedures for enforcing CAATSA.

2. The CBP press release also did not provide a reason to believe that Smart Apparel had "dealings" with Sunrise "in connection with"

20

Nordstrom's order. The district court explained its conclusion otherwise only by stating that "Sunshine [sic] was part of a supply chain for Smart Apparel." ER-13. But the Complaint alleges that Sunrise and Smart Apparel had separate supply chains and, even if the two supply chains did overlap, that would not support the idea that the parties had "dealings" in connection with the orders at issue.

3. Finally, the district court's reliance on Paragraph 8's warranty concerning a Sanctioned Person's "interest" in Smart Apparel separately fails because this warranty does not provide a basis for cancellation.

The plain language of Paragraph 4.E's cancellation right permits cancellation only based on issues related to the cancelled "shipment" itself. Because the warranty that no "Sanctioned Person" has an "interest" in Smart Apparel involves only the status of another corporate entity, with no connection to the "shipment," a breach of that warranty would not permit cancellation of the order.

The other listed grounds for cancellation in Paragraph 4 confirm this plain language reading. Each makes the cancellation right

contingent on a problem with the specific "shipments" or "merchandise" at issue.

The district court's reading of the purchase orders as permitting cancellation based on warranties that are unrelated to the order is commercially unreasonable. The default rule under Washington law is that contractual warranties are not conditions precedent to performance unless the contract explicitly says so, and the purchase order does not. Instead, it permits expansive indemnity and possible damages for noncompliance with warranties that are not related to a particular shipment.

At a minimum, whether Paragraph 4.E permits termination on non-shipment related grounds is ambiguous. Smart Apparel's reading therefore prevails because Washington law construes ambiguous contract language against the drafter—here, Nordstrom. Alternatively, the ambiguity created an issue of fact concerning the contract's meaning making it inappropriate for resolution on a motion to dismiss.

B. The CBP press release did not provide reason to believe Smart Apparel breached the Forced Labor warranties. The district court failed

to take the Complaint allegations as true, as required on a motion to dismiss, in concluding otherwise.

The Complaint specifically alleged that Smart Apparel did not use forced labor in its supply chain and that Nordstrom knew this based on years of audits. That is dispositive. Nordstrom cannot have "reason to believe" that Smart Apparel uses forced labor if it knows for a fact that Smart Apparel does not. The Complaint squarely alleges that Nordstrom knew just that.

The district court failed to engage with these allegations and instead cited the Complaint as establishing that Sunrise was part of the supply chain for Smart Apparel. But the Complaint explains that Sunrise has its own supply chain with dozens of factories unrelated to Smart Apparel and Smart Apparel only used four facilities in connection with the order, none of which are anywhere near North Korea.

II. The district court independently erred in dismissing Smart Apparel's claim for breach of implied covenant of good faith and fair dealing.

The covenant of good faith and fair dealing applies when a contract grants one party discretion to invoke a contractual right. And per the district court's own reading of the purchase orders, Nordstrom had significant discretion to determine whether it had "reason to believe" that Smart Apparel was not in compliance with warranties. Accordingly, Nordstrom had to exercise this discretion in good faith. Smart Apparel pled that Nordstrom breached this duty by falsely claiming that it had "reason to believe" that Smart Apparel was in violation of its warranties when Nordstrom in fact knew that Smart Apparel was not.

The district court erred as a matter of Washington law in treating Smart Apparel's good-faith-and-fair-dealing claim as rising and falling with its contract claim. Even were the district court correct that Nordstrom had discretion under the contract to cancel its orders based merely on the CBP press release, Nordstrom violated the duty of good faith and fair dealing if it exercised this discretion in bad faith. The district court appeared to misread the Complaint as alleging that Nordstrom violated a duty to conduct an investigation, when the

Complaint merely cited Nordstrom's failure to conduct an investigation as one of many indicia that it was acting on a pretext.

## STANDARD OF REVIEW

This Court "review[s] de novo an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, accepting as true all well-pleaded allegations of material fact and construing those facts in the light most favorable to the non-moving party." *Judd v. Weinstein*, 967 F.3d 952, 955 (9th Cir. 2020). "Dismissal is affirmed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims which would entitle it to relief." *Ernst & Haas Mgmt. Co. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022) (internal alterations omitted). "It is axiomatic that the motion to dismiss is viewed with disfavor and is rarely granted." *Id.* (internal alterations omitted).

## ARGUMENT

## I.    The District Court Erred In Dismissing Smart Apparel's Claim For Breach Of Contract.

The district court dismissed Smart Apparel's breach-of-contract claim only by accepting Nordstrom's own expansive reading of the Nordstrom-drafted contract.  Under that reading, a press release about

25

a distant corporate parent—with no connection to the shipment at issue—conferred upon Nordstrom unbounded discretion to terminate a $6.7 million order with Smart Apparel, no questions asked. That is wrong. The CBP press release did not permit cancellation of the order based on either the "Sanctioned Person" warranties, *infra* § A, or the "forced labor" warranties, *infra* § B. The district court erred in concluding otherwise.

### A.  The Sanctioned Person warranties do not permit cancellation based on the CBP press release.

Smart Apparel made two representations in Paragraph 8 concerning "Sanctioned Persons" that are at issue here: (1) that no Sanctioned Person had an "interest" in Smart Apparel and (2) that Smart Apparel did not "engage[] in any dealings" with any Sanctioned Person "in connection with this purchase order." ER-52. The district court held, based on the CBP press release about Sunrise, that Smart Apparel was "not in compliance" with these representations. ER-12-13, 15. And it held that this purported noncompliance was grounds for cancellation under Paragraph 4.E, because a "plain reading of Paragraph 4 allows for cancellation for '[s]hipments which [Nordstrom]

has reason to believe are not in compliance with the [Terms and Conditions]'" of the purchase order. ER-13.

These conclusions are rife with error. Most importantly, the CBP press release does not afford "reason to believe" that Sunrise is a "Sanctioned Person" within the meaning of Paragraph 8, foreclosing application of both Sanctioned Person warranties. *Infra* § 1. The warranty regarding "dealings" with a "Sanctioned Person" is inapplicable for the independent reason that the press release suggests no such "dealings" "in connection with" the order at issue. *Infra* § 2. And the warranty regarding a Sanctioned Person's "interest" in Smart Apparel is inapplicable for the further reason that breach of that warranty cannot be a ground for termination at all under the purchase order. *Infra* § 3.

> **1. Neither Sanctioned Person warranty applies because the CBP press release did not provide reason to believe that Sunrise is a Sanctioned Person.**

Paragraph 8 of the purchase order defines a Sanctioned Person as "a person, entity, or government" that is either "(i) identified on the Specially Designated Nationals and Blocked Persons List … and/or any similar list" or "(ii) subject to trade restrictions under United States

law, including … [CAATSA]." ER-52. In the district court's view, the CBP press release was enough to "indicate[] that [Sunrise] was subject to trade restrictions." *Id.* The district court made no attempt to construe the term "trade restrictions" or explain why the temporary, rebuttable presumption Sunrise faced would unambiguously qualify.

The district court got it wrong. Reading the contract as a whole, the term "trade restrictions" in the definition of "Sanctioned Person" most naturally refers to a final designation of an entity's status as restricted from importing into the U.S. The district court's expansive interpretation of "trade restriction" erroneously embraced an entity, Sunrise, that retained the right to show that its imports *should not* be restricted—and, indeed, whose imports *were never even detained*, let alone restricted from entry.

**a.** Though the words "trade restriction" may appear broad standing alone, that is no way to read a contract. Contractual terms must be interpreted by "[v]iew[ing] the contract as a whole," *Viking Bank v. Firgrove Commons 3, LLC*, 334 P.3d 116, 120 (Wash. Ct. App. 2014), and by considering "the dictates of the context." *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 908 (9th Cir. 2001). And when it comes

to commercial contracts, the terms in the agreement must be given "a commercially reasonable construction." *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 952 P.2d 590, 597 (Wash. 1998). Here, two key contextual elements of Paragraph 8 establish that a party subject to a mere rebuttable presumption under CAATSA is not a "Sanctioned Person," because a temporary detention of merchandise is not a "trade restriction."

First, the term "trade restrictions" must be read in light of the term it is defining—"Sanctioned Person." The word "Sanction" suggests a punishment, ban, or embargo imposed for the violation of law; the use of the past-tense "Sanctioned" suggests that this punishment, ban, or embargo has already been imposed. And because the word "Sanctioned" modifies "Person" in the definition, that naturally suggests some final designation of the *Person's status* as a party subject to an already-imposed sanction resulting from the violation of law.

The second key contextual indicator is that the term "trade restrictions" appears in a series of categories that make up the definition of "Sanctioned Person." Alongside it are persons "identified on the Specially Designated Nationals and Blocked Persons List ...

29

and/or any similar list." ER-52. The Specially Designated Nationals and Blocked Persons List is a list administered by the Office of Foreign Assets Control (OFAC) within the Department of Treasury. Congressional Research Service, *National Security Review Bodies: Legal Context and Comparison* (Nov. 9, 2022), https://crsreports.congress.gov/ product/pdf/LSB/LSB10848. Placement on the list represents a final agency determination that an individual or company is subject to sanctions. And the sanctions concerned are severe, typically denying the designated person access to nearly all aspects of the U.S. financial system and transactions with any U.S. person. *Id.*

Under the principle of ejusdem generis, a seemingly broad term in a "series of specific terms[,] … should not be given its broadest possible meaning, but rather should extend only to matters of the same … nature as the terms specifically enumerated." *Kitsap County v. Allstate Ins. Co.*, 964 P.2d 1173, 1185 (Wash. 1998); *see Lombardo v. Pierson*, 852 P.2d 308, 312 (Wash. 1993) (*ejusdem generis* applies in contract cases). This follows from common sense—it would be most unusual for a defined term to delineate a series of very narrow categories, then tack on a sprawling catch-all at the end. Under this principle, the term

30

"trade restrictions" must be read to connote the same types of final designations that are necessary for inclusion in the rest of the terms' definition. For a "trade restriction" to be of the "same nature" as a Specially Designated Nationals and Blocked Persons List designation, it must, at a minimum, be a final determination as to status that forbids the party from importing goods into the U.S.

**b.** The CBP press release did not announce the sort of "trade restrictions" on Sunrise that would render it a "Sanctioned Person." It did not use the words "sanctioned" or "restriction." Nor did it finally brand Sunrise in violation of any law. Instead, the release stated vaguely that an investigation had "indicat[ed]" that Sunrise had "North Korean labor in [its] supply chain," without providing any details. ER-35; *see* ER-22. And it states that CBP will detain Sunrise merchandise for further investigation pursuant to CAATSA's rebuttable presumption—detentions that never came to pass. ER-35; *see* ER-22.

As explained above (at 9-10), CAATSA's rebuttable presumption is *rebuttable*. A "prohibition [on entry] … shall not apply if [CBP] finds, by clear and convincing evidence," that the merchandise in question was not produced with forced labor. 22 U.S.C. § 9241a. Far from a final

status determination, then, CBP's imposition of CAATSA's rebuttable presumption is a preliminary procedural step that simply shifts the burden to the importer to demonstrate the absence of any restriction—and thus *avoid* being sanctioned.

**c.** The district court erred in concluding otherwise. It is not clear whether the district court's decision rested on an overreading of the CBP press release, an overly expansive reading of the term "trade restriction," or both. But in all events, it rests on error.

At times, the district court seemed to read the CBP press release for much more than the release said. For example, the district court stated that "the CBP issued a press release stating it had a reason to believe that Sunrise was a Sanctioned Person." ER-13. It most certainly did not. Again, the word "sanction" appears nowhere on the press release. Nothing in the press release or the allegations in the Complaint remotely suggest that CBP ever made a determination, threshold or otherwise, that Sunrise was subject to sanctions. Insofar as the district court concluded otherwise, it violated the cardinal rule on a Rule 12(b)(6) motion that all inferences must be drawn in favor of the non-moving party. *Judd*, 967 F.3d at 955.

32

Elsewhere, the district court seemed to appreciate that the press release announced only CBP's plans to "detain merchandise from Sunshine [sic] at the border" unless Sunrise could make the requisite showing. ER-12-13. Yet the court found, without analysis, that the term "trade restriction" embraced that limited detention. In doing so, it necessarily adopted a wildly expansive interpretation of "trade restriction" that would seemingly encompass virtually *any* temporary detention of goods at the border.

The problem with such a reading is that it is virtually limitless. After all, *any* import can be temporarily detained for any number of reasons—and then released into the U.S. with no adverse finding as to the product itself or its importer. CBP has broad authority to inspect merchandise and to detain merchandise while making a final determination as to its admissibility. 19 C.F.R. § 151.16. And, as the Supreme Court has explained, "[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977). In this broad sense, any and every import and importer is

subject to "trade restrictions." But such a reading would not be commercially reasonable.

Nor does the fact that Paragraph 8 generally lists "CAATSA" as a possible type of "trade restriction" mean that any action CBP takes under CAATSA automatically qualifies. ER-52. To the contrary, the district court's cursory treatment of the CBP press release as rendering Sunrise sanctioned is inconsistent with the entire CAATSA enforcement structure. *Cf. Blue Mountain Mem'l Gardens v. State Dep't of Licensing, Cemetery Board*, 971 P.2d 75, 77 (Wash. Ct. App. 1999) ("[A] term of art in a given field is given its technical meaning when used in an agreement within that field.").

As discussed above (at 9-10), CBP enforces CAATSA in a way that is akin to a Withhold Release Order. It first announces an investigation and then, *after* the investigation, determines whether the prohibition applies. Only if CBP conclusively determines that forced labor was used will it seize (as opposed to temporarily detain) the merchandise, publishing a formal Finding to that effect in the Federal Register. 19 C.F.R. § 12.42(f); *id.* § 12.44(b). At that point, a party has been

34

"Sanctioned"—subject to a trade restriction. Before that, it has been subjected only to an investigation.

The district court's ruling effectively transforms a rebuttable presumption into a final trade restriction. And to make matters worse, it does so despite the fact that CBP ultimately never even detained any of Sunrise's shipments. A never-implemented announcement of a possible temporary detention of goods pending investigation does not a Sanctioned Person or a trade restriction make. And at an absolute minimum, there is ambiguity with respect to whether the term "trade restriction" would embrace CAATSA's rebuttable presumption. The district court erred as a matter of law in resolving this question in Nordstrom's favor on a motion to dismiss.

> **2. The "dealings" with a Sanctioned Person warranty does not apply for the additional reason that Nordstrom had no reason to believe there were "dealings" "in connection with" the order.**

The district court's reliance on the Paragraph 8 warranty that Smart Apparel had no "dealings" with a Sanctioned Person "in connection with" the shipment also fails for a stark and independent reason: Neither the CBP press release nor the allegations in the

35

Complaint support the notion that Smart Apparel had "dealings" with Sunrise "in connection with" Nordstrom's purchase orders.

The district court's ruling on this issue is so empty that it merits only brief discussion. While the district court did not clearly explain its finding, it appears to have read the Complaint to allege that "Sunshine [sic] was part of a supply chain for Smart Apparel." ER-13. But the Complaint alleges the opposite. It says that Sunrise "utilizes dozens of mills and factories … that have nothing to do with Smart Apparel." ER-37; *see* ER-27 (same). Smart Apparel, in contrast, has its own supply chain and "only utilized four [mills or factories] in connection with the orders"—which Nordstrom knew did not use North Korean or other forced labor. ER-27; *see supra* 6-8. And even if the two entity's supply chains *did* overlap, that would not support the idea that the parties had "dealings" with respect to the particular order at issue.

### 3. The "interest" in a Sanctioned Person warranty is also inapplicable because it is not a basis for contract cancellation.

The district court's reliance on the Paragraph 8 warranty concerning a Sanctioned Person's "interest" in Smart Apparel similarly

fails for an independent reason: That warranty supplies no basis for cancellation at all.

The district court erroneously read Paragraph 4.E's cancellation right to embrace any suspected violation of the "Vendor Purchasing Guide," which itself embraces every last "term[] and condition[]" of the purchase order—including the Sanctioned Person warranties. But the text and surrounding context of Paragraph 4.E, read in light of basic notions of commercial reasonableness, foreclose a reading that Nordstrom can refuse an order based on issues unrelated to the "shipment" itself. And at a minimum, the termination provision is too ambiguous to permit resolution on a motion to dismiss. *Hensel Phelps Constr. Co. v. King County*, 787 P.2d 58, 62 (Wash. Ct. App. 1990) ("If … the provisions are ambiguous, issues of fact would exist." (citing *Spokane Helicopter Serv., Inc. v. Malone*, 623 P.2d 727, 730 (Wash. Ct. App. 1981))).

**a.** Beginning with the contract's plain language, Paragraph 4.E authorizes cancellation only of "*[s]hipments* which [Nordstrom] has reason to believe *are not in compliance*" with the "Vendor Purchasing Guide." ER-51 (emphasis added). This provision is naturally read to

37

permit cancellation based on issues related to the "shipment" itself—for example, a breach of a warranty concerning the labor practices used to fulfill that "shipment." But nothing in the text of Paragraph 4.E permits Nordstrom to cancel an order where the "shipment" itself is fully "in compliance." Because the warranty that no "Sanctioned Person" has an "interest" in Smart Apparel involves only the status of another corporate entity, with no connection to the "shipment," a breach of that warranty would not permit cancellation of the order.

If Nordstrom had intended to give itself a termination right for *any* violation of *any* of the purchase order's terms and conditions, it could have done so. See, for example, Paragraph 18 of the purchase order: "[F]ailure to comply with these terms and conditions, the provisions of any purchase order, or the applicable Vendor Purchasing Guide, will result in offset charges and handling fees being charged to Seller." ER-55. Paragraph 4.E could have similarly, and unambiguously, allowed Nordstrom to "refuse delivery" for "any failure to comply with these terms and conditions." But instead that provision limits termination rights to "shipments" that are non-compliant—a right that cannot be triggered by Sanctioned Person warranties that are

38

unrelated to the shipment itself. The district court erred by ignoring Paragraph 4.E's limiting language.

**b.** Reading Paragraph 4.E in the context of Paragraph 4's other grounds for cancellation confirms that Nordstrom's cancellation rights are triggered only by a shipment-specific problem. *See Scribner*, 249 F.3d at 908, 910 (courts must construe terms of a contract according to the "dictates of the context" in which they appear).

Each of the seven grounds for cancellation listed in Paragraph 4 makes the cancellation right contingent on a problem with the specific "shipments" or "merchandise" at issue, whether it was that the shipment was sent on the wrong timeline (Paragraph 4(A)), or with the wrong quantity (Paragraph 4(B)), or that the merchandise was not as specified (Paragraph 4(C)), or was otherwise defective (Paragraph 4(G)). ER-51. Under the district court's interpretation, Paragraph 4.E is an anomaly in this list—one expansive termination right based on breach of any term or condition, among six narrow shipment-related grounds.

This reading again violates the well-recognized ejusdem generis principle that a seemingly general term in a series "should extend only to matters of the same general class… as the terms specifically

enumerated." *Allstate*, 964 P.2d at 1185; *see supra* 30. Reading Paragraph 4.E to permit refusal of a shipment for non-shipment-related reasons violates this principle. Once again, the district court seemingly ignored this surrounding context in asserting that a "plain reading of Paragraph 4 allows for cancellation" for non-shipment-related reasons.

**c.** The district court's reading also fails because it is commercially unreasonable.

As the Washington Supreme Court has explained, "[w]here two commercial entities sign a commercial agreement, [the court] will give such an agreement a commercially reasonable construction." *Wilson*, 952 P.2d at 597 (footnote omitted). Reading Paragraph 4.E to permit refusal of a shipment only on shipment-related grounds makes good commercial sense. Under Smart Apparel's agreement with Nordstrom, once Nordstrom has placed an order, Smart Apparel begins producing the commissioned merchandise entirely at its own expense, receiving payment from Nordstrom only upon delivery. ER-31. Cancellation of an order after that outlay, before any payment, is therefore devastating not just to the manufacturer, but potentially everyone in the manufacturer's supply chain.

40

That result may be fair where the shipment itself is noncompliant—the buyer should get what it pays for. But it is hardly reasonable to treat every warranty in a purchase order, no matter how unconnected to a shipment, as a grounds for termination—especially where the manufacturer has to front the production costs. No manufacturer would accept that deal. Washington contract law has long recognized this through a default rule that contractual warranties are not "conditions precedent"—which excuse the other party's performance—but "promises"—the breach of which may subject the promisor to liability for damages. *Ross v. Harding*, 391 P.2d 526, 530-31 (Wash. 1964). And indeed, Paragraph 11 of the purchase order provides Nordstrom with a powerful non-termination-based remedy for "breach or alleged breach of any of these terms of conditions" in the form of an expansive indemnity. ER-53.

The district court's reading of Paragraph 4.E defies these background norms. The only way to make that provision embrace the "Sanctioned Person" warranty is to jettison any "shipment"-based limitation. But dispensing with such a limitation reads Paragraph 4.E. to allow Nordstrom to refuse any order based on mere "reason to

41

believe" that Smart Apparel was not in compliance with literally *any* provision *anywhere* in the purchase order, because all such provisions are embraced by the "Vendor Purchase Agreement" Paragraph 4.E references.

One need only peruse the other "terms and conditions" in the purchase order to see how unreasonable this reading is. If Nordstrom has mere "reason to believe" that Smart Apparel failed to get "written consent" from Nordstrom before disclosing Nordstrom "pricing" to a third party, ER-54 (¶ 12.A, D); that Smart Apparel placed Nordstrom's "trademark" on its website, ER-56 (¶ 21); or even that it did not submit "invoices [that] comply with the requirements of the applicable Vendor Purchasing Guide," ER-57 (¶ 27(a)), Nordstrom can terminate a several-million-dollar order. Nowhere in the district court's decision did it grapple with the full implications of its reading, let alone try to justify them as reasonable.

Nor is it necessary to excise Paragraph 4.E's "shipment" limitation in order to allow Nordstrom to keep tainted merchandise out of its stores. Nordstrom can cancel a shipment where the *shipment itself* is produced in violation of provisions involving forced labor. ER-51.

42

Paragraph 4.E incorporates shipment-related "forced labor" restrictions. *Id.* Paragraph 4.F permits Nordstrom to refuse delivery of "[m]erchandise which … has been detained." *Id.* And Paragraph 4.D specifically incorporates Smart Apparel's Paragraph 9 warranty that it does not use "forced labor." *Id.* (As explained *infra* 44-49, none of these provisions applies in this case.) What Nordstrom cannot do is cancel a shipment from Smart Apparel based on conjecture about the possibility that some other entity, outside of Smart Apparel's supply chain and control, is a "Sanctioned Person." ER-52.

**d.** At a minimum, whether Paragraph 4.E permits termination on non-shipment-related grounds is ambiguous. As a result, Smart Apparel's reading prevails by operation of Washington law. "[A]mbiguous contract language is strictly construed against the drafter"—here, Nordstrom. *Jones Assocs., Inc. v. Eastside Props., Inc.*, 704 P.2d 681, 685 (Wash. Ct. App. 1985). The presumption goes double here because of Washington's default rule, discussed above, that contractual representations should be construed as promises, not conditions precedent: "Where it is doubtful whether words create a

43

promise or an express condition, they are interpreted as creating a promise." *Ross*, 391 P.2d at 530-31.

And in all events, as long as the scope of Paragraph 4.E is at least ambiguous, the district court erred in finding as a matter of law that Nordstrom could refuse an order based on suspicions that a Sanctioned Person had a mere "interest" in Smart Apparel. *See Hensel Phelps*, 787 P.2d at 62 (contractual ambiguity creates "issues of fact").

## B. The CBP press release did not provide reason to believe Smart Apparel failed to comply with the Forced Labor warranties.

The district court also erred in finding that Nordstrom could refuse the order based on "reason to believe" Smart Apparel had breached warranties in Paragraphs 7 and 9 regarding forced labor. *See supra* 17 (reprinting those warranties). This ruling violated the most fundamental tenet of adjudicating motions to dismiss: It failed to accept the Complaint allegations as true. *See Judd*, 967 F.3d at 955. Accepting the Complaint allegations as true, and drawing all inferences in Smart Apparel's favor, Nordstrom had no "reason to believe" that Smart Apparel breached the Forced Labor warranties.

44

**1.** The allegations in the Complaint could not be clearer that Smart Apparel did not use forced labor in its supply chain and that *Nordstrom knew this* based on years of audits.

As detailed at length (at 6-8), the Complaint explains that "Smart Apparel did ***not*** utilize forced labor or North Korean labor in its supply chain." *See* ER-27 (emphasis in original). Smart Apparel carefully designed and continually monitors every stage of its production process, from its acquisition of raw materials through each stage of its manufacturing, "to comply with the highest ethical standards," which include its "strict[] prohibit[ion] [on] any type of forced labor." ER-30. And Smart Apparel has engaged "independent third-party companies" to conduct audits that have repeatedly confirmed that Smart Apparel does not use forced labor in its supply chain. *Id.*

The allegations in the Complaint are equally clear that Nordstrom not only lacked "reason to believe" that Smart Apparel uses forced labor, it *knew* that Smart Apparel *did not* use forced labor in its supply chain. Nordstrom "requires Smart Apparel to register with Nordstrom each of the facilities used in connection with goods manufactured for it." ER-32. It specifically "knew that the fabrics sourced for the cancelled

orders had been manufactured" at particular facilities located in "Vietnam and … China." *Id.* It also "knew that the manufactured fabrics for the cancelled orders had been assembled [into garments] at … two specific locations in Sri Lanka." ER-33.

Nordstrom further knew of each of Smart Apparel's audits, and knew that these audits repeatedly confirmed the absence of labor violations. When Smart Apparel audits its factories, "the results … are shared and discussed with Nordstrom." ER-30; *see* ER-33. And though "Nordstrom does not require audits" of "fabric mills," Smart Apparel "engages independent third parties to audit" those mills anyway, and Nordstrom is "aware that such audits occur." ER-30. Again, "[n]one of the audits … has ever indicated any use of forced labor or North Korean labor at any of the inspected facilities." ER-31.

This is dispositive. Nordstrom cannot have "reason to believe" that Smart Apparel uses forced labor if it knows that Smart Apparel does not. The Complaint squarely alleges that Nordstrom knew just that.

**2.** The district court's order nowhere references the key factual allegations described above, let alone explains how the court could rely

46

upon the Forced Labor warranties in the face of those allegations. *See* ER-4-17. The court based its inference that Smart Apparel used forced labor on the CBP press release's claim that *Sunrise*—with no reference to Smart Apparel—had used "North Korean" labor. ER-12-14. To connect this with Smart Apparel, the court then found that the Complaint's allegations "show that Sunshine's [sic] relationship with Smart Apparel was that Sunshine [sic] was part of the supply chain for Smart Apparel." ER-13.

The Complaint shows nothing of the sort. To begin with, the mere fact that Sunrise is Smart Apparel's corporate parent hardly establishes that the two entities' supply chains are one and the same. Nike, Inc. wholly owns Converse. Gerber is a subsidiary of Nestlé. And so on. One would not assume that these companies' supply chains are integrated. The assumption is no more reasonable for companies in Asia—and certainly not in a procedural context where all inferences must be drawn in *Smart Apparel's* favor.[3]

---

[3] CBP agrees. In the similar statutory framework of the UFLPA, *see supra* 10, CBP has explained that "[u]nless a subsidiary or affiliate is explicitly named," the "subsidiary or affiliate would not automatically be subject to the rebuttable presumption" of a parent company. *See*

In any event, the Complaint forecloses the district court's assumption that Smart Apparel's dress shirts were produced in the Sunrise supply chain implicated by the CBP press release. It explains that "[t]he CBP Release only pertains to Sunrise, not Smart Apparel" and "it does not state, much less suggest, that Smart Apparel 'through its *own* operation or its supply chain' used involuntary labor." ER-36. The Complaint goes on to explain that Sunrise has its own supply chain that "utilizes dozens of other mills and factories … that have nothing to do with Smart Apparel." ER-37; ER-27 (same). Smart Apparel, in contrast, "only utilized four [mills or factories] in connection with the orders." ER-27.

What is more, the Complaint details the locations of these four facilities—Vietnam, China, and Sri Lanka. The CBP press release's (never substantiated) allegations were that Sunrise had used "North Korean" labor. ER-12. Nothing in the Complaint supports the notion that the facilities in Smart Apparel's supply chain are anywhere near the regions where North Korean labor is typically used. And again, the

U.S. Dep't of Homeland Security, *UFLPA Frequently Asked Questions* (last updated July 9, 2024), https://www.dhs.gov/uflpa-frequently-asked-questions.

48

Complaint's allegations directly explain that Smart Apparel does not use North Korean labor and that Nordstrom knew it. *See* ER-32-33; *supra* 6-8.

Simply put, the Complaint alleges that Nordstrom knew as a matter of fact that Smart Apparel's supply chain did not use forced labor. The district court erred in failing to credit that allegation.

*\*\*\**

Each of the district court's "four ways" of blessing Nordstrom's termination of the party's contract either misreads the Complaint, misinterprets the purchase order, or both. This Court should hold that Smart Apparel is entitled to proceed past the pleading stage to discovery on its breach-of-contract claims.

## II. The District Court Erred In Dismissing Smart Apparel's Claim For Breach of Implied Covenant of Good Faith and Fair Dealing.

The district court independently erred in dismissing Smart Apparel's good-faith-and-fair-dealing claim. The gist of that claim is that even if the provisions in the purchase orders did permit Nordstrom to refuse an order based on an unsubstantiated press release, Nordstrom was still required to exercise its considerable discretion in

49

good faith. But according to the district court's circular logic, because "the terms of the contract" permitted Nordstrom "to cancel the orders," Smart Apparel could not state a good-faith-and-fair-dealing claim. ER-15. That ruling misunderstands Washington law and ignores the Complaint's allegations.

**A.** Washington law recognizes "in every contract an implied duty of good faith and fair dealing" that "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991) (en banc) (collecting cases). This duty "applies to the performance of specific contract obligations" and it specifically "applies when one party has discretionary authority to determine certain terms of the contract." *Rekhter v. State Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014).

Washington courts have held that this duty applies to all manner of contractual provisions,[4] including contract cancellation rights. *See*

---

[4] *See, e.g.*, *Metro. Park Dist. of Tacoma v. Griffith*, 723 P.2d 1093, 1100 (Wash. 1986) (concession agreement); *Frank Coluccio Constr. Co. v. King County*, 150 P.3d 1147, 1154 (Wash. Ct. App. 2007) (construction contract); *Curtis v. N. Life Ins. Co.*, 147 Wash. App. 1030 (2008)

*Century 21 Real Est. Ctr. v. Silvers*, 130 Wash. App. 1030 (2005) (unpublished) (applying covenant of good faith and fair dealing to contract cancellation). Other jurisdictions agree that "[a]n arbitrary cancellation is a breach of the covenant of good faith and fair dealing." *Helfand v. Nat'l Union Fire Ins. Co.*, 10 Cal. App. 4th 869, 906 (1992). And the broader or more nebulous a grant of discretion is under a contract, the more indispensable the duty of good faith and fair dealing becomes. Otherwise a party enjoying an advantage in bargaining power could turn its own broad drafting into "a blank check … to define terms however it chooses." *Scribner*, 249 F.3d at 910.

Cases like this one are what good-faith-and-fair-dealing claims are made for. Under Nordstrom and the district court's reading of the purchase order, Nordstrom enjoyed broad but defined power to reject an order based vaguely on "reason to believe" that Smart Apparel has not complied with one or more of various specific representations. As the district court recognized, this "reason to believe" language naturally entails "discretion," ER-11—in the context of the purchase orders,

---

(insurance policy); *Taylor v. Shigaki*, 930 P.2d 340, 344 (Wash. Ct. App. 1997) (attorney retainer); *In re Marriage of Sievers*, 897 P.2d 388, 390 (Wash. Ct. App. 1995) (marital property settlement).

51

Nordstrom's discretion to identify a breach of various warranties. Indeed, Nordstrom's power is so broad that once it discerns this undefined "reason to believe," it can terminate the contract, investigate to confirm these reasons, or simply do nothing and accept the order—at its discretion.

With this power came the obligation to exercise it in good faith. "Good faith" entails both "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Scribner*, 249 F.3d at 910 (quoting Restatement (Second) of Contracts § 205 cmt. a (1979)). Smart Apparel pled that Nordstrom breached this duty. As detailed (at 12-15), the Complaint alleges that whatever the CBP press release could have suggested in the abstract, Nordstrom relied upon it purely as a pretext. It *claimed* that the press release afforded "reason to believe" that Smart Apparel had violated its contractual representations, when it in fact knew that Smart Apparel had not.

So eager was Nordstrom to proceed with its pretextual termination that it "neglect[ed] even to inquire with Smart Apparel regarding the CBP press release." ER-41. When Smart Apparel tried to

explain, Nordstrom did not listen. ER-42. Even when Smart Apparel showed Nordstrom "a subsequent audit of Sunrise's entire supply chain" showing "no … labor issues," Nordstrom still would not budge. *Id.*

This entire course of conduct was contrary to the "common purpose" of the contract—that Smart Apparel would promptly and fully manufacture Nordstrom's orders, and that Nordstrom would accept and pay for them as long as they were free from defect. It was contrary to Smart Apparel's "justified expectations" that it would be paid as long as it complied with its warranties. And it betrayed years of close collaboration between Nordstrom and Smart Apparel during which Smart Apparel repeatedly demonstrated its compliance with all warranties.

Acting without "honesty" violates the covenant of good faith and fair dealing. *Scribner*, 249 F.3d at 910 (citing *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1136 (Wash. 1986) (en banc)); *see Frank Coluccio Constr.*, 150 P.3d at 1155 ("false[] represent[ation]" violation of covenant of good faith and fair dealing). So too, "subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified" and "evasion of the spirit

53

of the bargain will [also] constitute bad faith." *Scribner*, 249 F.3d at 910. Nordstrom's conduct was all of the above.

**B.** The district court committed two key errors in nonetheless rejecting Smart Apparel's claim.

**1.** *First*, the district court erred as a matter of Washington law in treating Smart Apparel's good-faith-and-fair-dealing claim as rising and falling with its contract claim. In its single sentence of reasoning explaining its dismissal of the good-faith-and-fair-dealing claim, the district court held that Smart Apparel failed to plausibly state a claim because "[t]he Court has already determined that the terms of the contract are unambiguous and that [t]he CBP Press Release provided a reason for Nordstrom to believe that the terms of the contract had been violated and to cancel the orders." ER-15.

But under Washington law, "[i]t is … possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract." *Rekhter*, 323 P.3d at 1041. "Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract." *Id.* The district court itself acknowledged that "[b]reach of good faith

54

and fair dealing does not require breach of the terms of the contract" in its recitation of Washington law, before contradicting itself by finding that the absence of breach foreclosed the claim. ER-15.

Even were the district court correct that Nordstrom had discretion under the contract to cancel its orders based merely on the CBP press release, *but see supra* § I.A.1, Nordstrom violated the duty of good faith and fair dealing if it exercised this discretion in bad faith. Falsely claiming reason to believe Smart Apparel violated its contractual obligations—as Smart Apparel pled Nordstrom did—is a violation of the covenant of good faith and fair dealing. *See supra* II.A. So is terminating a purchase order on feigned human rights grounds when the true motivation was economic. *See Cavell v. Hughes*, 629 P.2d 927, 929 (Wash. Ct. App. 1981) (considering the defendant's purpose, knowledge, and intent to assess good faith); *Jones v. Hollingsworth*, 560 P.2d 348, 351 (Wash. 1977) (same). At the motion to dismiss stage, the court was required to take these allegations of bad faith as true. *See Judd*, 967 F.3d at 955.

**2.** *Second*, the district court appeared to misread the Complaint's allegations concerning Nordstrom's violation of its duty of good faith

and fair dealing. The district court seemed to think that the only basis for Smart Apparel's claim is that "Nordstrom canceled the Subject Orders based solely on the CBP Press Release without conducting an adequate (or any) investigation." ER-15. Though the court did not make its reasoning explicit, it may have rejected Smart Apparel's claim based on the notion that Nordstrom had no *duty to investigate*. Insofar as this was the basis for dismissal, it is error.

Smart Apparel alleged that Nordstrom violated the good-faith covenant because it exercised its cancellation discretion dishonestly on a pretext—in bad faith. *See, e.g.*, ER-44. To be sure, Smart Apparel invoked Nordstrom's failure to investigate the CBP press release as a fact that supports an inference of Nordstrom's bad faith. *See* ER-41-42 (listing Nordstrom's failure to investigate as one of the "facts currently known to Smart Apparel [that] indicate Nordstrom's bad faith"). But Nordstrom's failure to investigate is neither Smart Apparel's theory of liability nor the only basis it identified to support Nordstrom's bad faith.

\*\*\*

56

The district court's narrow reading of the Complaint, coupled with its flawed understanding of Washington law, led it to erroneously dismiss Smart Apparel's good-faith-and-fair-dealing claim. And by reading the purchase order to afford Nordstrom expansive discretion to reject an order, while permitting Nordstrom to exercise that discretion in bad faith, the court countenanced Nordstrom's deeply unfair commercial behavior. That behavior should not go unchecked. Smart Apparel deserves the opportunity to take discovery and prove its claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

July 22, 2024

Respectfully submitted,

*/s/ Christopher J. Cariello*
Christopher J. Cariello
Katherine E. Munyan
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for Plaintiff-Appellant Smart Apparel (U.S.), Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 24-2269

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Christopher J. Cariello          **Date** 7/22/24
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**                                                                 *New 12/01/18*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-2269

I am the attorney or self-represented party.

**This brief contains <u>10611</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs;
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Christopher J. Cariello    **Date** 7/22/24
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**    *Rev. 12/01/22*