## No. 24-2269

# In The United States Court of Appeals For the Ninth Circuit

SMART APPAREL (U.S.), INC.,

*Plaintiff-Appellant,*

v.

NORDSTROM, INC.

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Washington
Case No. 2:23:cv-01754-TLF
Hon. Theresa L. Fricke

## ANSWERING BRIEF FOR DEFENDANT-APPELLEE NORDSTROM, INC.

David A. Perez
*Counsel of Record*
Christian W. Marcelo
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-8000
DPerez@perkinscoie.com
CMarcelo@perkinscoie.com

Megan K. Houlihan
PERKINS COIE LLP
1120 N.W. Couch St, 10th Fl
Portland, OR 97209
Telephone: (503) 727-2241
MHoulihan@perkinscoie.com

Lauren Pardee Ruben
PERKINS COIE LLP
1900 16th Street, Suite 1400
Denver, CO 80202
Telephone: (646) 284-5835
LRuben@perkinscoie.com

*Counsel for Defendant-Appellee*
*Nordstrom, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Defendant Nordstrom, Inc. states that it is a publicly held corporation, that it has no parent corporation, and that no publicly held corporation owns ten percent or more of its stock.


*/s/David A. Perez*
David A. Perez

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... iii

INTRODUCTION ................................................................. 1

STATEMENT OF THE ISSUES .............................................. 3

    I.    Whether the district court correctly concluded that Nordstrom had grounds to cancel its purchase orders with Smart Apparel because the U.S. Customs and Border Protection's press release gave Nordstrom "reason to believe" that Smart Apparel violated the contract's representations and warranties. ...................................... 3

    II.    Whether the district court correctly concluded that Nordstrom could exercise its contractual authority to cancel purchase orders with Smart Apparel without breaching the implied duty of good faith and fair dealing ................................. 4

STATEMENT OF JURISDICTION ........................................ 4

STATEMENT OF THE CASE .............................................. 4

    I.    Factual allegations ............................................. 4

        A.    The parties' contract included representations and warranties prohibiting the use of forced labor and dealings with North Korea. ......................................... 4

        B.    U.S. Customs and Border Protection issued a press release announcing that it had "evidence" that Smart Apparel's parent company used North Korean labor ......................... 7

        C.    Nordstrom canceled its purchase orders with Smart Apparel after learning about CBP's press release ............................... 10

II. The district court's order dismissing Smart Apparel's complaint ........................................... 10

SUMMARY OF THE ARGUMENT ................................. 12

ARGUMENT ...................................................... 14

I. The district court correctly concluded that CBP's press release allowed Nordstrom to cancel the purchase orders.............................................. 14

A. The contract's phrase "reason to believe" authorized Nordstrom to act on belief rather than knowledge. ......................... 16

B. The "reason to believe" standard applied broadly to violations of the representations and warranties in the Terms and Conditions. ........................................... 22

C. Nordstrom had "reason to believe" Smart Apparel violated four representations and warranties in the Terms and Conditions. ............. 27

1. Section 7: Involuntary labor in the supply chain................................... 27

2. Section 8: Direct or indirect dealings with a Sanctioned Person or Sanctioned Territory.................................... 30

3. Section 8: A Sanctioned Person's interest in Smart Apparel ........................... 34

4. Section 9.A: Producing and processing merchandise in violation of applicable laws......................................... 35

II. The district court correctly concluded that no breach of the implied duty occurred where the

parties' contract expressly authorized
Nordstrom's actions. .......................................................37

CONCLUSION ....................................................................44

# TABLE OF AUTHORITIES

## CASES

*Badgett v. Sec. State Bank*,
807 P.2d 356 (Wash. 1991) ................................................ 38, 39, 40, 42

*Bd. of Trade of City of Chicago v. Commodity Futures Trading Comm'n*,
605 F.2d 1016 (1979)..................................................................... 18, 19

*City of Edmonds v. Bass*,
481 P.3d 596 (Wash. Ct. App. 2021), *aff'd*, 508 P.3d 172
(Wash. 2022) ...................................................................................... 23

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012)............................................................ 36

*Est. of Carter v. Carden*,
455 P.3d 197 (Wash. Ct. App. 2019)................................................... 37

*Haywood v. Amazon.com, Inc.*,
2023 WL 4585362 (W.D. Wash. July 18, 2023)................................. 15

*Hearst Commc'ns, Inc. v. Seattle Times Co.*,
115 P.3d 262 (Wash. 2005) ......................................................... 14, 15

*Humane Soc. of U.S. v. Brown*,
920 F. Supp. 178 (Ct. Int'l Trade 1996)........................................ 19, 20

*Humane Soc. of U.S. v. Clinton*,
44 F. Supp. 2d 260 (Ct. Int'l Trade 1999), *aff'd*, 236 F.3d
1320 (Fed. Cir. 2001) ........................................................................ 19

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) .............................................. 23

*Iron Silver Mining Co. v. Reynolds*,
124 U.S. 374 (1888)........................................................................... 20

168784855.6

*Johnson v. Yousoofian,*
930 P.2d 921 (Wash. Ct. App. 1996), *as amended* (Jan. 9,
1997) ................................................................................ 42

*Kaley v. United States,*
571 U.S. 320 (2014) .......................................................... 20

*King County v. Vinci Const. Grands Projets,*
364 P.3d 784 (Wash. Ct. App. 2015), *aff'd sub nom. King
County v. Vinci Constr. Grands Projets / Parsons
RCI / Frontier-Kemper, JV*, 398 P.3d 1093 (Wash. 2017) .................. 21

*Maryland v. Pringle,*
540 U.S. 366 (2003) .......................................................... 20

*Milliron v. United Benefit Life Ins. Co.,*
566 P.2d 582 (Wash. Ct. App. 1977) .................................... 26

*Myers v. Washington,*
218 P.3d 241 (Wash. Ct. App. 2009) ...................... 15, 29, 38

*Ragnar Enter. v. Tapley,*
110 Wash. App. 1033, 2002 WL 234841 (2002) ............................ 42, 43

*Rekhter v. Washington State Department of Social and
Health Services,*
323 P.3d 1036 (Wash. 2014) ...................................... 41, 42

*Scribner v. Worldcom, Inc.,*
249 F.3d 902 (9th Cir. 2001) ............................................ 41

*Seattle-First Nat'l Bank v. Westwood Lumber, Inc.,*
829 P.2d 1152 (Wash. Ct. App. 1992) ......................... 42, 43

*Steckman v. Hart Brewing, Inc.,*
143 F.3d 1293 (9th Cir. 1998) .......................................... 36

*United States v. Gorman,*
314 F.3d 1105 (9th Cir. 2002) .......................................... 20

168784855.6

*United States v. Noster*,
    590 F.3d 624 (9th Cir. 2009)........................................................... 20

*Wilson Ct. Ltd. P'ship v. Tony Maroni's, Inc.*,
    952 P.2d 590 (Wash. 1998) ........................................................... 26

*Windermere Real Est. Oak Tree, Inc. v. Tran*,
    123 Wash. App. 1061, 2004 WL 2429562 (2004)............................... 43

## STATUTES

22 U.S.C. § 9241a(a) ..................................................................... 8, 28

22 U.S.C. § 9241a(b) ......................................................................... 9

22 U.S.C. § 9401 et seq..................................................................... 6, 7

Countering America's Adversaries Through Sanctions Act........... passim

High Seas Driftnet Fisheries Enforcement Act...................................... 19

## REGULATIONS

19 C.F.R. § 12.42 ........................................................................ 18, 27

168784855.6

## INTRODUCTION

Human rights abuses in North Korea are ubiquitous. Much of North Korean labor comes from children, prisoners, and other forced laborers. So much so that the United States has determined that products made by North Korean nationals or citizens anywhere in the world are presumptively made with forced labor. As an importer of finished products, Nordstrom takes extremely seriously any allegations that goods it buys have been made with North Korean labor.

Nordstrom does not just pay lip service to its concerns about suppliers using North Korean labor or contributing to human rights abuses. Nordstrom's contracts give the company the right to cancel purchase orders if Nordstrom has any "reason to believe" that suppliers have violated representations and warranties that include keeping supply chains free from forced labor. The "reason to believe" standard in the contracts is critical to Nordstrom's ability to reject merchandise that not only is *in fact* produced with forced labor but that also *may appear* to regulators or customers as tainted by human rights abuses. This standard also allows Nordstrom to protect its brand and safeguard its principles without sending investigators to the ends of the earth, or

1

getting mired in prolonged litigation, to confirm whether suppliers are using sweatshops.

In this case, Nordstrom learned that the U.S. government suspected that the parent company of Plaintiff-Appellant Smart Apparel was using North Korean labor in its supply chains. In a press release, U.S. Customs and Border Protection ("CBP") announced that it had investigated the parent company, Zhejiang Sunrise Garment Group Ltd ("Sunrise"), and would take the drastic step of detaining Sunrise's merchandise at all American ports of entry. CBP would continue to detain the merchandise unless Sunrise provided clear and convincing evidence that it did not rely on forced labor at any stage of the production process.

Like Nordstrom's other contracts with suppliers, its contract with Smart Apparel allowed Nordstrom to cancel purchase orders based on a "reason to believe" that Smart Apparel violated representations and warranties about the use of forced labor in its supply chain and ties to North Korea. CBP's press release gave Nordstrom more than enough "reason to believe" that Smart Apparel had violated these representations and warranties through its parent company's use of

2

North Korean labor. So, exercising its contractual rights, Nordstrom canceled its outstanding purchase orders with Smart Apparel.

Smart Apparel would not accept Nordstrom's decision and sued Nordstrom for breach of contract and breach of the implied duty of good faith and fair dealing. The district court correctly dismissed these claims, concluding that Nordstrom acted well within its contractual rights in canceling the outstanding purchase orders.

This Court should affirm for the same reason. In its contract with Nordstrom, Smart Apparel agreed that Nordstrom had discretion to cancel the purchase orders if Nordstrom had reason to believe that Smart Apparel was connected to human rights abuses, including the use of North Korean labor. Nordstrom's decision to exercise this authority is not a breach of any express or implied terms of the parties' contract. Smart Apparel has no legal grounds to hold Nordstrom liable for standing on its ethical principles and contractual right to stop doing business with any company that has been credibly accused of human rights violations.

## STATEMENT OF THE ISSUES

I.   Whether the district court correctly concluded that Nordstrom had grounds to cancel its purchase orders with Smart Apparel because

the U.S. Customs and Border Protection's press release gave Nordstrom "reason to believe" that Smart Apparel violated the contract's representations and warranties.

II.    Whether the district court correctly concluded that Nordstrom could exercise its contractual authority to cancel purchase orders with Smart Apparel without breaching the implied duty of good faith and fair dealing.

## STATEMENT OF JURISDICTION

Nordstrom agrees with Smart Apparel's jurisdictional statement.

## STATEMENT OF THE CASE

## I.    Factual allegations

Nordstrom takes the following factual allegations from Smart Apparel's First Amended Complaint (ER-25–ER-48) and the documents incorporated into the First Amended Complaint by reference (ER-22–ER-24, ER-51–ER-58).

### A.    The parties' contract included representations and warranties prohibiting the use of forced labor and dealings with North Korea.

Smart Apparel manufactures clothing at production facilities in Southeast Asia. ER-25–ER-26. Nordstrom contracted with Smart Apparel to purchase men's dress shirts. ER-34. The contract consisted of electronic purchase orders that incorporated Nordstrom's Purchase Order Terms and Conditions ("Terms and Conditions"). ER-32,

4

ER-51. In the Terms and Conditions, Smart Apparel agreed that Nordstrom could refuse delivery of merchandise, or cancel purchase orders, if Nordstrom had "reason to believe" that Smart Apparel violated any part of the Terms and Conditions, including the representations and warranties. *Id.* (Sections 1, 4.D, 4.E).[1]

The Terms and Conditions included specific representations and warranties about labor practices and dealings with North Korea.

**Section 4.D**: Nordstrom could refuse delivery of "[m]erchandise which [Nordstrom] has reason to believe is not as represented or as warranted, including as set forth in Section 9 [regarding applicable labor laws]." *Id.*

**Section 4.E**: Nordstrom could refuse delivery of "[s]hipments which [Nordstrom] has reason to believe are not in compliance with the [Terms and Conditions], including without limitation . . . US or Canada customs requirements, and child or forced labor requirements." *Id.*

---

[1] The Terms and Conditions reference a "Vendor Purchasing Guide." ER-51 (Sections 1, 4.E). The parties do not dispute that, as relevant here, the "Vendor Purchasing Guide" is synonymous with the Terms and Conditions.

5

**Section 7**: Smart Apparel warranted and certified "that it does not and will not in violation of applicable law, custom or practice . . . utilize, through its own operations or its supply chain, . . . any involuntary labor of any kind including child labor, prison labor, state-sponsored forced labor, indentured or bonded labor, labor obtained through human trafficking, coercion or slavery, labor defined as forced labor under any United States law, or labor defined as forced by the [international] forced labor indicators and accompanying guidance." ER-52.

**Section 8**: Smart Apparel warranted and certified that "neither [Smart Apparel] nor any party working on [Smart Apparel's] behalf is a Sanctioned Person or engages in any dealings, directly or indirectly, with a Sanctioned Person or Sanctioned Territory in connection with this purchase order." *Id.* Smart Apparel further warranted and certified that "no Sanctioned Person has any interest of any nature whatsoever in [Smart Apparel] or any party working [on Smart Apparel's] behalf." *Id.* The Terms and Conditions defined "Sanctioned Person" as an entity "subject to trade restrictions under United States law, including . . . the Countering America's Adversaries [Through] Sanctions Act, 22 U.S.C.

9401 et seq." *Id.* The Terms and Conditions defined "Sanctioned Territory" to include "North Korea." *Id.*

**Section 9.A**: Finally, Smart Apparel warranted and certified that its "merchandise . . . was produced and processed in strict compliance with all applicable federal . . . laws . . . , including . . . labor, trade sanctions, export, import/customs, and wage and hour (including minimum wage and overtime) laws and regulations." *Id.*

Every one of the purchases Nordstrom made from Smart Apparel was subject to a purchase order that included the Terms and Conditions. ER-32.

**B.  U.S. Customs and Border Protection issued a press release announcing that it had "evidence" that Smart Apparel's parent company used North Korean labor.**

On December 27, 2022, CBP, an agency within the U.S. Department of Homeland Security, issued a press release titled "CBP Enforces Countering America's Adversaries Through Sanctions Act":

7

## CBP Enforces Countering America's Adversaries Through Sanctions Act

**Release Date:** Tue, 12/27/2022

*Agency is detaining merchandise based on evidence that these entities use North Korean Labor in their supply chains.*

**WASHINGTON** — U.S. Customs and Border Protection (CBP) began detaining merchandise produced or manufactured by Jingde Trading Ltd., Rixin Foods. Ltd., and Zhejiang Sunrise Garment Group Co. Ltd. at all U.S. ports of entry on Dec. 5, 2022. This enforcement action is the result of a CBP investigation indicating that these companies use North Korean labor in their supply chains in violation of the Countering America's Adversaries Through Sanctions Act (CAATSA).

CAATSA prohibits the entry of goods, wares, and articles mined, produced, or manufactured wholly or in party by North Korean nationals or North Korean citizens anywhere in the world, unless clear and convincing evidence is provided that such goods were not made with convict labor, forced labor, or indentured labor under penal sanctions. Pursuant to CAATSA, CBP will detain merchandise from these entities at all U.S. ports of entry unless there is clear and convincing evidence that forced labor was not present at any stage of the production process. Evidence must be provided within 30 days of notice of detention. If the importer fails to provide clear and convincing evidence within this timeframe, the merchandise may be subject to seizure and forfeiture.



"CBP is committed to keeping America's supply chains free of goods produced with forced labor and to eliminating this horrific practice," said CBP Office of Trade Executive Assistant Commissioner AnnMarie R. Highsmith. "North Korea's forced labor system operates both domestically and internationally and supports the North Korean Government's weapons of mass destruction and ballistic missile programs, and it is also a major human rights violation. Legally and morally, we cannot allow these goods into our commerce."

ER-22 (emphasis added).

The Countering America's Adversaries Through Sanctions Act ("CAATSA") prohibits "any significant goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part by the labor of North Korean nationals or citizens" from entering the United States. 22 U.S.C. § 9241a(a). This prohibition is subject to one exception, where CBP "finds, by clear and convincing evidence, that the goods, wares, articles, or merchandise . . . were not produced with

8

convict labor, forced labor, or indentured labor under penal sanctions." *Id.* § 9241a(b). These statutory terms mean that goods produced in North Korea or by North Korean laborers are presumptively excluded from the United Sates. The purpose of detaining goods under CAATSA, as the CBP explained, is to "keep[ ] America's supply chains free of goods produced with forced labor and to eliminat[e] [the] horrific practice," because "[l]egally and morally, we cannot allow these goods into our commerce." ER-22–ER-23.

The December 2022 press release announced that CBP had begun detaining merchandise produced and manufactured by Sunrise, Smart Apparel's parent company, which is based in China. *Id.*; *see also* ER-35 (admitting that Sunrise is "Smart Apparel's ultimate corporate parent"). The detention began after CBP found "**evidence** that [Sunrise] use[s] North Korean labor in [its] supply chains" in violation of CAATSA. ER-22 (emphasis added).

The detention would continue until Sunrise submitted to CBP "clear and convincing evidence that forced labor was not present at any stage of the production process." *Id.* Although Sunrise had 30 days to present evidence of the absence of forced labor in its supply chain, the

press release did not give a timeline for when CBP would make a final determination about whether Sunrise violated CAATSA. *Id.*

### C. Nordstrom canceled its purchase orders with Smart Apparel after learning about CBP's press release.

About two and half weeks after CBP published the press release, Nordstrom canceled all Smart Apparel purchase orders that had not yet cleared customs in the United States. ER-33. In a January 13, 2023 email, Nordstrom told Smart Apparel that Nordstrom was "cancelling all outstanding orders for which the product has not cleared customs in the destination country as of the time of this email." *Id.* Nordstrom explained that it had "compelling reasons to believe that the manufacture of Smart Apparel products has involved violations of our Purchase Order Terms and Conditions, including the provisions regarding forced labor." ER-34. Nordstrom cited CBP's press release as the reason for its belief. *Id.*

## II. The district court's order dismissing Smart Apparel's complaint

Smart Apparel sued Nordstrom for canceling the purchase orders. Among other claims not at issue in this appeal, Smart Apparel brought claims for breach of contract and breach of the implied covenant of good

10

faith and fair dealing. ER-43–ER-45. Nordstrom moved to dismiss these claims, and the district court granted the motion. ER-4–ER-17 (district court order dismissing Smart Apparel's First Amended Complaint).

The district court concluded that the plain text of the parties' contract—set out in the Terms and Conditions—authorized Nordstrom to cancel the purchase orders. The district court considered both the Terms and Conditions and the CBP press release as incorporated into the operative complaint by reference. ER-8. Looking at Sections 4, 7, 8, and 9 of the Terms and Conditions, the district court read the plain text as giving Nordstrom a right to refuse delivery of merchandise if it had "reason to believe" that a violation of Smart's Apparels' representations or warranties in the Terms and Conditions had occurred. ER-11.

The district court concluded that, considering the pleadings and the incorporated CBP press release, Nordstrom had "reason to believe" that Smart Apparel had violated four representations and warranties:

(1) utilizing any involuntary labor of any kind directly or in its supply chain (Section 7);

(2) engaging with a Sanctioned Person or Territory, defined to include an entity subject to trade restrictions under CAATSA (Section 8);

11

(3) allowing a Sanctioned Person to have an interest in Smart Apparel or any other party working on Smart Apparel's behalf (Section 8); and

(4) producing and processing merchandise not in compliance with applicable laws, regulations, orders, testing requirements, and ordinances of the country of origin and country of destination (Section 9).

ER-11–ER-14. Under Section 4, these believed violations gave Nordstrom "four sufficient bases to refuse delivery of the merchandise that had not cleared customs at the time that the CBP Press Release was issued." ER-14.

The district court's determination that "the terms of the contract are unambiguous and that the CBP Press Release provided a reason for Nordstrom to believe that the terms of the contract had been violated" disposed of both Smart Apparel's breach of contract claim and claim for violation of the implied duty of good faith and fair dealing. ER-15–ER-16. The district court dismissed these claims with prejudice and without leave to amend. ER-17.

## SUMMARY OF THE ARGUMENT

On appeal, Smart Apparel challenges the district court's decision to dismiss the breach of contract and implied duty claims. The text of the Terms and Conditions should be the beginning and end of Smart

Apparel's breach of contract claim. The Terms and Conditions authorized Nordstrom to cancel purchase orders with Smart Apparel whenever Nordstrom had "reason to believe" that Smart Apparel had violated the contract's representations and warranties. There is no contract breach where the contract authorizes the party's conduct.

The plain, obvious meaning of "reason to believe" is belief based on probability rather than knowledge or certainty. The reason to believe standard broadly applied to breaches of the representations and warranties in Sections 7, 8, and 9 of the Terms and Conditions. CBP's press release—announcing that CBP had evidence that Smart Apparel's parent company used North Korean labor—gave Nordstrom reason to believe that Smart Apparel had violated representations and warranties in Sections 7, 8, and 9 related to the use of forced labor and dealings with North Korea. Nothing in the Terms and Conditions required Nordstrom to verify its belief with an independent investigation. CBP's press release triggered Nordstrom's authority to cancel the purchase orders under the unambiguous terms of the parties' contract.

13

The text of the Terms and Conditions also should be the beginning and end of Smart Apparel's implied duty claim. A party does not breach the duty of good faith and fair dealing by doing what it is contractually authorized to do. The Terms and Conditions authorized Nordstrom to cancel purchase orders where Nordstrom had reason to believe that Smart Apparel had violated the representations and warranties. Nordstrom did not breach any implied duty by doing exactly that.

## ARGUMENT

### I. The district court correctly concluded that CBP's press release allowed Nordstrom to cancel the purchase orders.

Washington law governs the Terms and Conditions. ER-56 (Section 23). Washington follows "the objective manifestation theory of contracts." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). "Under this approach," courts "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Id.* This means "the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." *Id.* The "ordinary, usual, and popular meaning" of the words in the

14

contract controls "unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.*

The text of the Terms and Conditions is unambiguous. Nordstrom had the right to refuse delivery of Smart Apparel's shipments based on a "reason to believe" that Smart Apparel violated the representations and warranties in the Terms and Conditions. CBP's press release supplied this reason. There is no breach where a party does what it is expressly authorized to do under the contract. *Myers v. Washington*, 218 P.3d 241, 244 (Wash. Ct. App. 2009); *see Haywood v. Amazon.com, Inc.*, 2023 WL 4585362, at *4 (W.D. Wash. July 18, 2023) ("Courts in the Ninth Circuit have routinely held that a breach of contract claim is not legally cognizable when based on conduct that the contract permits.") (collecting cases).

Smart Apparel, however, asks this Court to speculate about Nordstrom's state of mind when it canceled the purchase orders. To be clear, Nordstrom disagrees with Smart Apparel's story about why Nordstrom canceled the purchase orders. Nordstrom's sole motivation was its commitment to respecting human rights and protecting its brand. But Nordstrom's motivations and subjective intent are

15

irrelevant. The plain text of the Terms and Conditions control, and there can be no reasonable disagreement that Nordstrom had the right to terminate the contract according to the ordinary meaning of the contract's words.

### A. The contract's phrase "reason to believe" authorized Nordstrom to act on belief rather than knowledge.

The Terms and Conditions gave Nordstrom the right to cancel purchase orders if Nordstrom had "reason to believe" that any merchandise was not "as represented and warranted." ER-51 (Section 4.D). The Terms and Conditions also gave Nordstrom the right to cancel if any shipments were "not in compliance with" the Terms and Conditions. ER-51 (Sections 1, 4.E). At the risk of stating the obvious, the phrase "reason to believe" allowed Nordstrom to terminate the contract even if it did not have actual knowledge of a violation.

Smart Apparel attempts to twist this standard by focusing on what it alleges did and did not happen. Smart Apparel insists, for example, that this Court should consider the alleged fact that CBP never actually detained any of Sunrise's merchandise. Opening Br. at 28. Smart Apparel also asks the Court to consider the allegation that CBP did not complete a "final status determination." Opening Br.

16

at 31–32. Smart Apparel likewise points to audits supposedly showing that Smart Apparel did not use forced labor. Opening Br. at 36, 45. But these alleged facts are red herrings. All that matters is whether CBP's press release gave Nordstrom a "reason to believe" that Smart Apparel violated the relevant representations and warranties.

The purpose of having a "reason to believe" standard is clear. If the contract were otherwise, and required actual proof that Smart Apparel violated the representations and warranties, Nordstrom would be stuck scouring the globe for hidden sweatshops. Naturally, a party that would use children or forced laborers to make its products also would have no compunction covering up its use of this type of labor. And if Nordstrom had to mount an international investigation **to confirm what a government investigation already uncovered**, in the meantime Nordstrom's global brand would continue to suffer from association with a human rights violator. That's not the bargain the parties made.

The "reason to believe" text in the Terms and Conditions mirrors the text of CBP regulations regarding forced labor. The regulations require "any port director or other principal Customs officer" to inform

17

the CBP Commissioner if he or she "has **reason to believe** that any class of merchandise that is being, or is likely to be, imported into the United States is being produced . . . in any foreign locality with the use of convict labor, forced labor, or indentured labor under penal sanctions." 19 C.F.R. § 12.42(a) (emphasis added). Such a report to the CBP Commissioner triggers an investigation like the one described in CBP's press release about Sunrise. *Id.* § 12.42(d).

Courts have not interpreted the "reason to believe" standard in the CBP regulations. But in other contexts, courts have interpreted the phrase "reason to believe" as a grant of broad discretionary authority. For example, the Seventh Circuit held that the Commodity Futures Trading Commission had unreviewable discretion to determine the existence of an emergency where Congress empowered the Commission to act "whenever it [had] **reason to believe** that an emergency exist[ed]." *Bd. of Trade of City of Chicago v. Commodity Futures Trading Comm'n*, 605 F.2d 1016, 1022 (1979) (emphasis added). "Congress obviously employed the phrase 'whenever it has reason to believe' to indicate that the reason to believe must be held by the **Commission**," the Seventh Circuit explained, so the district court was

18

not entitled to "substitute[ ] its judgment for the Commission's" on that question. *Id.* at 1022 n.7 (emphasis added).

The U.S. Court of International Trade interpreted the same phrase in the High Seas Driftnet Fisheries Enforcement Act. *Humane Soc. of U.S. v. Clinton*, 44 F. Supp. 2d 260 (Ct. Int'l Trade 1999), *aff'd*, 236 F.3d 1320 (Fed. Cir. 2001). The Court concluded that "**belief, not knowledge**, is sufficient to satisfy the reason to believe standard." *Id.* at 274 (emphasis added). This is not "an exacting standard requiring significant detail." *Id.*

In reaching this interpretation, the court affirmed its prior ruling that "the reason-to-believe requirement" means "knowledge of some fact or facts calculated to produce a belief in the mind of an ordinarily intelligent man or knowledge of other facts which, although not amounting to direct knowledge, would cause a reasonable person, knowing the same facts, to reasonably conclude." *Humane Soc. of U.S. v. Brown*, 920 F. Supp. 178, 191 (Ct. Int'l Trade 1996) (internal quotation marks and citations omitted). The ruling drew on the U.S. Supreme Court's long recognition of "'a wide difference' between belief

19

and knowledge." *Id.* (quoting *Iron Silver Mining Co. v. Reynolds*, 124 U.S. 374, 384 (1888)).

In criminal cases, the Ninth Circuit has equated the phrase "reason to believe" with "probable cause." *United States v. Gorman*, 314 F.3d 1105, 1115 (9th Cir. 2002). The U.S. Supreme Court has said that "[t]he probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). But the standard generally boils down to "a reasonable ground for belief." *Id.* (internal quotation marks omitted). It "does not require proof beyond a reasonable doubt," only a showing that "a prudent person would have concluded that there was a fair probability that" a certain set of facts existed. *United States v. Noster*, 590 F.3d 624, 630 (9th Cir. 2009). It "is not a high bar" and "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up).

Nordstrom and Smart Apparel are presumed to have known these interpretations of "reason to believe" when they used the phrase in the

20

Terms and Conditions. *King County v. Vinci Const. Grands Projets*, 364 P.3d 784, 806 (Wash. Ct. App. 2015) ("[T]he presumption is that the contracting parties know the law."), *aff'd sub nom. King County v. Vinci Constr. Grands Projets/Parsons RCI/Frontier-Kemper, JV*, 398 P.3d 1093 (Wash. 2017). Based on the parties' use of this phrase, there can be only one conclusion about when Nordstrom could cancel purchase orders.

The Terms and Conditions unambiguously gave Nordstrom the right to cancel based on belief, rather than knowledge. Smart Apparel admits as much. Opening Br. at 51–52 ("[T]his 'reason to believe' language naturally entails 'discretion,'—in the context of the purchase orders, Nordstrom's discretion to identify a breach of various warranties." (citation omitted)). This is not an exacting standard or a high bar. It requires a fair probability rather than certainty, which means that all Smart Apparel's factual arguments are beside the point. The crux of the case is whether the U.S. government's belief about use of North Korean labor by Smart Apparel's parent company—based on "evidence" found by CBP (ER-22)—gave Nordstrom a credible basis to believe that Smart Apparel violated the Terms and Conditions.

21

**B.** **The "reason to believe" standard applied broadly to violations of the representations and warranties in the Terms and Conditions.**

The "reason to believe" standard appears in two sections of the Terms and Conditions: Sections 4.D and 4.E. Section 4.D allows for termination based on "reason to believe" any "[m]erchandise . . . is not as represented or as warranted." ER-51. And Section 4.E allows for termination based on "reason to believe" any "[s]hipments . . . are not in compliance with" the Terms and Conditions. *Id.* (Sections 1, 4.E). Sections 4.D and 4.E do not distinguish between particular representations and warranties or exclude any part of the Terms and Conditions; they unambiguously apply to *all* representations and warranties in the Terms and Conditions.

Smart Apparel suggests that Section 4.D is limited to the warranty in Section 9, regarding "forced labor." Opening Br. at 43. But the text of Section 4.D says otherwise. It specifies that Nordstrom may cancel purchase orders based on a credible reason to believe violations of representations and warranties have occurred, "**including** those as set forth in Section 9." ER-51 (emphasis added). Courts have interpreted words like "includes" as "normally impl[ying] that the

22

proffered definition falls short of capturing the whole meaning." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1224 (C.D. Cal. 2017). Washington courts, in particular, have recognized that "the term 'including' is one of enlargement, not restriction." *City of Edmonds v. Bass*, 481 P.3d 596, 601–02 (Wash. Ct. App. 2021), *aff'd*, 508 P.3d 172 (Wash. 2022). The word "including" in Section 4.D does not restrict the section's terms to only the representations and warranties in Section 9 but rather gives Section 9 as an example.[2]

Smart Apparel also argues that the word "shipments" in Section 4.E. means that only violations related to "a shipment-specific problem" allow for cancelation. Opening Br. at 39–42. In Smart Apparel's view, provisions like those in Section 8, regarding Sanctioned Persons and Sanctioned Territories, are unrelated to shipments and cannot provide grounds for termination under Section 4.E. *Id.* Smart Apparel also argues that Section 4.E required Nordstrom to believe a violation occurred for a particular shipment instead of shipments of

---

[2] Notably, Section 9 includes warranties similar to those found in Sections 7 and 8, including warranties about compliance with labor, trade sanctions, and import/customs laws. ER-51. This further confirms that the types of representations and warranties Section 4.D was intended to cover includes those found in Sections 7 and 8.

merchandise in general. *Id.* at 42–43. But Smart Apparel's arguments fall apart under a common-sense reading of the contract's text.

Section 4.E gives examples of when Nordstrom would have reason to believe that shipments are not in compliance with the Terms and Conditions. These reasons broadly include U.S. "customs requirements" and "forced labor requirements." ER-51. Section 8's prohibitions deal exclusively with customs and forced labor requirements, such as those imposed by CAATSA. ER-52. The plain text establishes that reason to believe any shipment is not in compliance with the requirements in Section 8, including a Sanctioned Person having an interest in Smart Apparel at the time of a shipment, gave Nordstrom grounds to cancel the purchase orders with Smart Apparel.

Further, Section 4.E does not say that Nordstrom can only cancel a purchase order if it has reason to believe a shipment for that particular purchase order violated forced labor requirements. The section broadly applies to refusal of merchandise when "[s]hipments . . . are not in compliance with . . . child or forced labor requirements." ER-51. The plain and common-sense meaning of this provision is that Nordstrom can cancel any purchase order if it believes any of Smart

24

Apparel's shipments violate the representations and warranties on forced labor. To hold otherwise would mean that Nordstrom would have to continue accepting merchandise **from a company that uses children or forced laborers** so long as Nordstrom could not tie a particular shipment to the human rights abuses at a particular facility. This sort of requirement would incentivize suppliers to play shell games with the origin of each shipment. That is clearly not the deal Nordstrom made.

Smart Apparel resorts to arguing that applying Section 4.E's "reason to believe" standard to every violation of the Terms and Conditions would be "commercially unreasonable." Opening Br. at 40–42. This argument fails for two reasons. First, Smart Apparel focuses on an irrelevant hypothetical. Not every part of the Terms and Conditions is at issue in this case. Nordstrom canceled the purchase orders based only on terms related to customs and forced labor requirements, and the district court addressed only those terms. Whether terms about trademarks and invoices would allow for termination is entirely beside the point.

Second, Washington courts consider whether a contract construction is "commercially reasonable" only after concluding that a contract contains an "ambiguity." *Wilson Ct. Ltd. P'ship v. Tony Maroni's, Inc.*, 952 P.2d 590, 597 (Wash. 1998). Smart Apparel gets this inquiry exactly backwards. It argues that this Court should consider commercial reasonableness to locate an ambiguity in the contract. Opening Br. at 40–43. Washington law requires the opposite.

Regardless of the reasonableness of a contract's terms, the plain meaning of the text controls, and courts will not rewrite a contract based on what they think the parties should have done. *See Milliron v. United Benefit Life Ins. Co.*, 566 P.2d 582, 584 (Wash. Ct. App. 1977) ("[T]hese rules of construction cannot be applied by the court to rewrite the contract or override the apparent intention of the parties where the language is clear and unambiguous."). Under these black-letter rules of construction, the "reason to believe" standard in Sections 4.D and 4.E applies to violations of other sections of the Terms and Conditions, including Sections 7, 8, and 9.

### C. Nordstrom had "reason to believe" Smart Apparel violated four representations and warranties in the Terms and Conditions.

CBP's press release announced the agency's belief that Sunrise used North Korean labor in its supply chains in violation of CAATSA. ER-22. The press release also said that CBP was actively "detaining merchandise" from Sunrise and would continue to do so unless Sunrise produced "clear and convincing evidence that forced labor was not present at any stage of the production process." *Id.* Presumably, CBP acted on the "reason to believe" standard set out in the CBP regulations on forced labor. 19 C.F.R. § 12.42. The press release about CBP's actions against Sunrise, Smart Apparel's parent company, in turn, gave Nordstrom "reason to believe" that Smart Apparel had violated four representations and warranties in the Terms and Conditions.

#### 1. Section 7: Involuntary labor in the supply chain

CBP's press release gave Nordstrom "reason to believe" that Smart Apparel used involuntary labor in "its supply chain," in violation of the representations and warranties in Section 7. ER-52. In its press release, the CBP said it believed that Sunrise, Smart Apparel's parent company, was using North Korean labor—which is presumptively

27

forced labor under CAATSA, 22 U.S.C. § 9241a(a)—in its supply chain. Nordstrom cannot be faulted for believing that Smart Apparel's supply chain overlapped with the supply chain of its parent company.

In fact, Smart Apparel admits that it shares a supply chain with Sunrise. In its First Amended Complaint, Smart Apparel alleges that "[w]hereas Smart Apparel's ultimate corporate parent utilizes dozens of mills and factories in its supply chain, **Smart Apparel only utilized four in connection with the orders**." ER-27 (First Am. Compl. ¶ 10) (emphasis added). **Smart Apparel admits that it used four of the same mills and factories as Sunrise**—that means the two companies' supply chains overlapped. Smart Apparel then explains that because Smart Apparel used only four of the dozens of mills and factories Sunrise uses, it is "exceedingly unlikely that one of Smart Apparel's mills or factories had been implicated when one considers the fact that the CBP Release did not indicate the pervasiveness of the alleged forced labor issues in the supply chain of Smart Apparel's ultimate corporate parent." *Id*. If Smart Apparel did not use the same supply chain as Sunrise, then the pervasiveness of forced labor issues

28

would have no effect on the likelihood that Smart Apparel's mills and factories were implicated.

Smart Apparel confirms again that it shares a supply chain with Sunrise later in the First Amended Complaint. It alleges that it hired an auditor "to audit every facility in Sunrise's supply chain, **including facilities not used for merchandise manufactured by Smart Apparel for Nordstrom**." ER-42 (First Am. Compl. ¶ 78(e)) (emphasis added). Of course, that also means that Smart Apparel used some facilities in Sunrise's supply chain to manufacture merchandise for Nordstrom.

But ultimately, Smart Apparel's argument on appeal that its supply chain and Sunrise's supply chain are not "one and the same" misses the point. Opening Br. at 47–48. The relevant question is whether Nordstrom had reason to believe that the supply chains of parent and subsidiary overlapped. Nordstrom could be wrong and still have had a reasonable belief. *See Myers*, 218 P.3d at 244 (holding that where a contract allowed termination upon "a finding of neglect," "sufficient cause" to terminate existed where "[a]n Adult Protective

29

Services investigator" concluded there was neglect but the finding of the investigator was later reversed).

Because Nordstrom had reason to believe that Sunrise's and Smart Apparel's supply chains overlapped, CBP's press release about Sunrise also gave Nordstrom reason to believe that Smart Apparel relied to some extent, even if indirectly, on forced labor to manufacture the merchandise that it would ship to Nordstrom under the purchase orders. In these circumstances, the Terms and Conditions authorized Nordstrom to cancel all purchase orders with Smart Apparel.

### 2. Section 8: Direct or indirect dealings with a Sanctioned Person or Sanctioned Territory

CBP's press release also gave Nordstrom "reason to believe" that Smart Apparel or a "party working on [Smart Apparel's] behalf . . . engages in any dealings, directly or indirectly, with a Sanctioned Person or Sanctioned Territory in connection with" Nordstrom's purchase orders, in violation of Section 8. ER-52. The press release said that CBP believed that Sunrise violated CAATSA and that CBP was detaining Sunrise's merchandise. The announcement was enough for Nordstrom to believe that Sunrise was "subject to trade restrictions" under CAATSA and met the definition of a "Sanctioned Person." Because

30

Sunrise is Smart Apparel's parent company, Smart Apparel undeniably had at least indirect "dealings" with Sunrise or part of Sunrise's supply chain. Further, CBP's belief that Sunrise used North Korean labor gave Nordstrom "reason to believe" that Smart Apparel, through Sunrise or their shared supply chain, had dealings with the Sanctioned Territory of North Korea.

Smart Apparel's dealings with its parent company necessarily occurred in connection with Nordstrom's purchase orders. Sunrise was Smart Apparel's parent company at the time of the purchase orders. There is no way to separate Smart Apparel's connection to its parent company from any of Smart Apparel's business dealings, including the purchase orders placed by Nordstrom.

Smart Apparel has nothing to say about whether there was reason to believe it had indirect dealings with the Sanctioned Territory of North Korea. Clearly, it did if Sunrise did, as set out in the CBP press release. Instead, Smart Apparel argues that Nordstrom cannot have actually believed that Sunrise was a "Sanctioned Person." Smart Apparel emphasizes that CBP's press release does not use the term "sanctions" and only a final determination by CBP gives rise to any

31

"trade restrictions." Opening Br. at 32–35. Like the emperor's weavers spinning cloth out of air, Smart Apparel points to supposed contract requirements where none exist. It did not take much to see the emperor had no clothes, and it does not take much here to see Smart Apparel's arguments for the threads that they are. The contract does not require Nordstrom to become a legal expert on CAATSA or CBP enforcement mechanisms. The Terms and Conditions allow for cancelation based on Nordstrom's "reason to believe" that Smart Apparel had indirect dealings with an entity "subject to trade restrictions." CBP's press release about detaining Sunrise's merchandise would have led any layperson to believe that Sunrise was subject to trade restrictions. That is enough.

But Smart Apparel is also wrong that Sunrise was not subject to "trade restrictions" as the parties used that term in their contract. "Trade restrictions" does not have some secret or hyper-technical meaning in the context of the Terms and Conditions. It simply means restrictions under CAATSA and other similar laws. ER-52 (Section 8). There is no question that CBP said it was placing restrictions on Sunrise (by detaining its merchandise "at all U.S. ports of entry") under

32

CAATSA. ER-22. This is a "trade restriction" under Section 8. Such a straightforward reading of the contract is not "virtually limitless" as Smart Apparel argues. Opening Br. at 33. It is specifically tied to one of the four statutes listed as examples of trade restrictions.

Smart Apparel attempts to complicate these questions by urging the Court to apply the principle of *ejusdem generis*. Opening Br. at 30. There is no need for that. Section 8 unambiguously applies to restrictions placed under CAATSA. And, what's more, Smart Apparel gets its analysis wrong. In attempting to apply the principle of *ejusdem generis*, Smart Apparel claims the term "trade restrictions" should be of the "same nature" as terms like "Specially Designated Nationals" and "Blocked Persons List." *Id.* at 31. Smart Apparel misreads the contract. Those terms—"Specially Designated Nationals" and "Blocked Persons List"—appear in Section 8(i), which provides one set of scenarios where a party may be identified as a Sanctioned Person. The term "trade restrictions" appears in the next section, Section 8(ii), which identifies U.S. laws, like CAATSA, that can restrict a party's ability to import goods into the United States. ER-52. Smart Apparel's proffered contract interpretation rules do not apply to this unambiguous text.

Finally, Smart Apparel argues that the CBP's detention of Sunrise's goods under CAATSA cannot be a "trade restriction" because Sunrise had the opportunity to rebut CBP's findings. Opening Br. at 31–35. Again, Smart Apparel attempts to add terms to the contract that aren't there. There is no requirement anywhere in Section 8 that the "trade restrictions" must be part of a "final determination" by CBP. And even if the rebuttable presumption in CAATSA mattered, the standard for Sunrise to rebut the presumption that its use of North Korean labor involves human rights violations is significantly higher than a mere "reason to believe"—it requires a showing of "clear and convincing" evidence. This high standard confirms that Nordstrom had "reason to believe" Sunrise was subject to trade restrictions under CAATSA at the time of CBP's press release.

### 3. Section 8: A Sanctioned Person's interest in Smart Apparel

CBP's press release gave Nordstrom "reason to believe" that a Sanctioned Person had an interest in Smart Apparel, also in violation of Section 8. ER-52. As explained above, CBP's announcement that it believed Sunrise violated CAATSA and was detaining Sunrise's merchandise indicated that Sunrise was "subject to trade restrictions"

34

and was therefore a "Sanctioned Person." As Smart Apparel's corporate parent, Sunrise undeniably had an interest in Smart Apparel. This interest existed when Smart Apparel would have been shipping merchandise to Nordstrom to fulfill the purchase orders.

That Nordstrom had the right to cancel purchase orders shipped while a Sanctioned Person (Sunrise) had "any interest" in Smart Apparel is a common-sense reading of the contract. If a Sanctioned Person has an interest in one of Nordstrom's suppliers, it increases the risk that CBP will detain the merchandise or that the manufacturing of the merchandise involved human rights violations. The Terms and Conditions naturally authorize Nordstrom to mitigate such risks by canceling its orders with that supplier.

### 4. Section 9.A: Producing and processing merchandise in violation of applicable laws

Finally, CBP's press release gave Nordstrom "reason to believe" that the merchandise Smart Apparel would ship under the purchase orders was not "produced and processed in strict compliance with all applicable laws," in violation of Section 9.A. ER-52. CBP's press release could not have been clearer. CBP announced it had "evidence" that Sunrise violated CAATSA through the use of North Korean labor. ER-

35

22. Violations of CAATSA by Smart Apparel's parent company gave Nordstrom reason to believe that Smart Apparel also produced and processed merchandise in violation of CAATSA.

Smart Apparel wants this Court to probe Nordstrom's motivations and familiarity with Smart Apparel's supply chain. Opening Br. at 44–45. Smart Apparel insists that it did not use forced labor and that this should determine the outcome of Nordstrom's motion to dismiss. *Id.* at 46–49. But Smart Apparel cannot get around the CBP press release, which Smart Apparel incorporated by reference into its complaint. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (affirming dismissal of a complaint based on documents incorporated by reference); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.").

If the **U.S. government** had reason to believe Smart Apparel's parent company used North Korean labor in violation of CAATSA, then Nordstrom certainly had reason to believe Smart Apparel's production process had ties to this violation. Even accepting all Smart Apparel's

allegations as true, Smart Apparel still cannot credibly dispute that CBP's press release gave Nordstrom reason to believe that Smart Apparel violated the Terms and Conditions.

* * *

Nordstrom did not need actual knowledge that a violation of the Terms and Conditions had occurred. It did not need to wait for CBP to take a final action or officially label Sunrise a "Sanctioned Person." Nor did Nordstrom need CBP to make announcements specifically about Smart Apparel. The press release itself, based on CBP's evidence about Sunrise, gave Nordstrom reason to believe that Smart Apparel, as Sunrise's subsidiary, violated four representations and warranties in the Terms and Conditions. Nordstrom accordingly had grounds to cancel the purchase orders per the plain terms of the parties' contract.

## II. The district court correctly concluded that no breach of the implied duty occurred where the parties' contract expressly authorized Nordstrom's actions.

Washington law recognizes an implied duty of good faith and fair dealing in every contract. *Est. of Carter v. Carden*, 455 P.3d 197, 202 (Wash. Ct. App. 2019). But this "duty is not free-floating" and "arises only in connection with terms agreed to by the parties." *Id.* (quoting

37

*Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991)). The duty does not work "a material change in the terms of [a party's] contract." *Badgett*, 807 P.2d at 360. And a party does not breach the implied duty simply by standing "on its rights to require performance of a contract according to its terms." *Id.* Nor does a party breach the implied duty by exercising expressly granted authority to terminate a contract. *See Myers*, 218 P.3d at 244 (concluding that the implied duty of good faith and fair dealing did not limit a party's ability to act within the scope of contract by exercising "broad authority to terminate the contract").

The Terms and Conditions authorized Nordstrom to cancel Smart Apparel's purchase orders where Nordstrom had "reason to believe" Smart Apparel violated the representations and warranties. The CBP Press Release supplied that "reason to believe." The contract imposed no express duty to investigate or compromise with Smart Apparel instead of canceling the purchase orders. The implied duty could not alter these material terms or give Smart Apparel more than it bargained for in the contract.[3]

---

[3] Amici curiae argue that Nordstrom breached the duty of good faith and fair dealing by supposedly ignoring the collateral consequences of canceling its purchase orders with Smart Apparel.

Smart Apparel's arguments to the contrary are much like the ones the Washington Supreme Court rejected in *Badgett*. 807 P.2d 356. There, the court considered a claim that a bank had a duty to a pair of farmers to consider the farmers' proposal to restructure their loan. *Id.* at 359. The court affirmed the trial court's dismissal of the farmers' claim, holding that "[t]he duty of good faith is not as broad as the [farmers] suggest." *Id.* at 360. The court explained that it could not "expand the existing duty of good faith to create obligations on the parties in addition to those contained in the contract." *Id.* The farmers

---

They notably take no position on whether the parties' contract authorized Nordstrom's actions or whether the cancelation ultimately "was indeed the better move as far as mitigating aggregate adverse human rights impact is concerned." Amici Br. at 31. This means their argument is entirely divorced from the text of the contract. It relies only on speculation about how Nordstrom might have further engaged with Smart Apparel and "investigate[d] whether, in fact, Smart Apparel's parent used North Korean forced labor" before canceling the purchase orders. *Id.* at 27–28.

Professors and theorists like amici curiae have the luxury of prolonged introspection about how much evidence of human rights abuses a company should have before it cancels a contract with a presumptive user of forced labor. But in the face of the very real prospect of inadvertently selling clothes made by children in North Korean sweatshops, Nordstrom had the contractual right to stop doing business with Smart Apparel immediately. Exercising this contractual right is not a breach of the duty of good faith.

"received the full benefit of their contract," and the bank had "no good faith obligation" to renegotiate the agreement. *Id.* at 360–61.

The court was unmoved by the farmers' argument that "the parties' course of dealing" created an expectation that the bank would renegotiate. *Id.* at 361. The course of dealing could not vary the contract's "express terms." *Id.* In sum, the farmers' implied duty claim failed because the contract did not obligate the bank to consider the farmers' restructuring proposal. *Id.* at 362.

Similarly, here, the express terms of the parties' contract gave Nordstrom the right to cancel the purchase orders on "reason to believe" that Smart Apparel violated the representations and warranties. Nordstrom did just that. That Nordstrom exercised its contractual authority does not mean that Smart Apparel received less than the full benefit of the contract; Smart Apparel got exactly what it should have expected under the contract's express terms. Smart Apparel nonetheless argues that Nordstrom's action "betrayed years of close collaboration," Opening Br. at 53, but "a course of dealing does not override express terms in a contract or add additional obligations," *Badgett*, 807 P.2d at 361.

40

Smart Apparel next points to this Court's decision in *Scribner v. Worldcom, Inc.*, 249 F.3d 902 (9th Cir. 2001), as support for Smart Apparel's implied duty claim. Opening Br. at 52–53. *Scribner* involved a party unilaterally redefining a term in a contract to "mean whatever it wanted it to mean." 249 F.3d at 911. Here, Nordstrom asks this Court to apply the ordinary meaning of the phrase "reason to believe." It is Smart Apparel, not Nordstrom, who wants "to change the ordinary meaning of words after the fact and without notice." *Id.*

Nordstrom's adherence to the plain language of the contract is not a "'double-secret' interpretation of a word to undermine the other party's justified expectations as to what that word means." *Id.* at 908. If anything, Smart Apparel had the secret interpretation. It argues that the Terms and Conditions had a hidden requirement for Nordstrom to "inquire with Smart Apparel," "listen" to Smart Apparel's concerns, and ultimately "budge" in favor of Smart Apparel's position. Opening Br. at 53. *Scribner* does not stretch the implied duty this far.

Nor is this case like *Rekhter v. Washington State Department of Social and Health Services*, 323 P.3d 1036 (Wash. 2014), on which Smart Apparel relies. *See* Opening Br. at 50, 54. In that case, the court

concluded that the implied duty limited a party's "discretion over a future contract term." *Rekhter*, 323 P.3d at 1042. A future contract term is not at issue here. The issue is Nordstrom's discretion under existing terms. The case is far more like *Badgett*, 807 P.2d 356, and other cases where courts have held that the duty of good faith does not restrict a party's discretion to exercise rights granted by the contract. *See, e.g.*, *Johnson v. Yousoofian*, 930 P.2d 921, 925 (Wash. Ct. App. 1996), *as amended* (Jan. 9, 1997) (holding that the duty of good faith did not prevent a landlord from exercising the right to withhold consent to assignment of the lease for any reason); *Seattle-First Nat'l Bank v. Westwood Lumber, Inc.*, 829 P.2d 1152, 1158 (Wash. Ct. App. 1992) (holding that a bank did not breach the duty of good faith by enforcing a promissory note according to its terms without offering additional notice or interim financing).

Finally, Smart Apparel argues that the district court overlooked Smart Apparel's allegations that Nordstrom breached the implied duty by acting "dishonestly on a pretext—in bad faith." Opening Br. at 56. Even if this were true (it is not), "it is of no consequence that [a party] may have had collateral reasons for terminating the [contract]." *Ragnar*

42

*Enter. v. Tapley*, 110 Wash. App. 1033, 2002 WL 234841, at *8 (2002) (unpublished). The implied duty does not prevent a party from exercising "the legitimate right to terminate." *Id.*; *see also Seattle-First Nat'l Bank*, 829 P.2d at 1158 (concluding that whether the bank "did not believe in good faith that the prospect of payment or performance was impaired" was "irrelevant" to the bank's right to demand additional collateral for renewal of a promissory note under the contract's express terms); *Windermere Real Est. Oak Tree, Inc. v. Tran*, 123 Wash. App. 1061, 2004 WL 2429562, at *3 (2004) (unpublished) ("But no matter Tran's possible motive or the custom of the industry, Tran had the right under the [contract's] express requirement to present accurate information about the collateral to the lender. Evidence of bad motive or industry custom is irrelevant.").

Where a contract authorizes a party's actions, motive doesn't matter. Nordstrom's purported motivations for canceling the purchase order are irrelevant to its right to do so under the contract's express terms. Nordstrom's decision to cancel the purchase orders did not violate the implied duty of good faith and fair dealing.

## CONCLUSION

Nordstrom requests that this Court affirm the district court's dismissal of Smart Apparel's breach of contract and implied duty claims.

September 23, 2024.                    Respectfully submitted,


                                       */s/David A. Perez*
                                       David A. Perez
                                       Christian W. Marcelo
                                       PERKINS COIE LLP
                                       1201 3rd Ave, Suite 4900
                                       Seattle, WA 98101


                                       Megan K. Houlihan
                                       PERKINS COIE LLP
                                       1120 N.W. Couch St, 10th Fl
                                       Portland, Oregon 97209


                                       Lauren Pardee Ruben
                                       PERKINS COIE LLP
                                       1900 16th Street, Suite 1400
                                       Denver, CO 80202


                                       *Counsel for Defendant-Appellee
                                       Nordstrom, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 23, 2024.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.


*/s/David A. Perez*
David A. Perez

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-2269_____

I am the attorney or self-represented party.

**This brief contains** 8,524_____ **words,** including 297____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ David A. Perez*_____ **Date** 09/23/2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*